# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 20, 2026

Lyle W. Cayce
Clerk

No. 24-11032

United States of America,

*Plaintiff—Appellee*,

*versus*

Raynaldo Rivera Ortiz, Jr.,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CR-378-1

Before Richman, Higginson, and Oldham, *Circuit Judges*.

Per Curiam:[*]

A jury found Raynaldo Rivera Ortiz, Jr. guilty of five counts of tampering with a consumer product in violation of 18 U.S.C. § 1365(a) and five counts of adulteration of a drug in violation of 21 U.S.C. §§ 331(k) and 333(b)(7). Dr. Ortiz challenges the sufficiency of the evidence to support the verdict, certain of the district court's evidentiary rulings, and an allegedly improper comment by the Government during closing argument. We affirm.

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-11032

## I

Raynaldo Rivera Ortiz, Jr. (Dr. Ortiz) was as an anesthesiologist in Dallas, Texas.[1]  He rendered his services through two of his own medical businesses,[2] which also employed several other providers.[3]  Dr. Ortiz practiced at various facilities throughout the area, including Baylor Scott and White Surgicare North Dallas (Surgicare).[4]  Surgicare is "an ambulatory surgical center," meaning that patients come in for "low risk surgeries" and usually leave on the same day.[5]

During the summer of 2022, Surgicare experienced several unusual complications.[6]  Between May 2022 and August 2022, Surgicare transferred fourteen patients[7] to a hospital for a higher level of care.[8]  Patients who were transferred had "hypertensive episodes (extreme high blood pressures) . . . [that Surgicare's patients] had not experienced in the past."[9]  These hypertensive episodes "would cause cardiac issues,"[10] making transfer necessary.

───────────────────

[1] ROA.54.

[2] *See* ROA.2157-58.

[3] *See* ROA.2183, 2186-87.

[4] *See* ROA.2168, 2190.

[5] ROA.1497.

[6] *See* ROA.1525 (Burks, Surgicare's administrator, ROA.1497, testifying that she recalled "a string of unusual complications during surgeries" at Surgicare).

[7] ROA.1526.

[8] ROA.1525.

[9] ROA.1525.

[10] ROA.1527.

2

No. 24-11032

Surgicare reviewed the fourteen transfer cases for potential causes of the patients' complications[11] because the number of transfers was higher than normal, compared to the five total patients transferred in the previous year.[12] Surgicare asked "numerous physicians" to review the cases.[13] It also performed a "root cause analysis,"[14] considering whether the cases involved the same nurse, physician, or operating room (OR);[15] "the patient[s'] history,"[16] whether the patients had Covid or had been vaccinated;[17] "the anesthesia record;"[18] and the "medications that were given."[19] The root cause analysis did not provide any common explanation for the transfers, and at the time of the analysis, Surgicare had no suspicions about Dr. Ortiz.[20] In addition, Surgicare had its "anesthesia machines serviced to make sure there was nothing there,"[21] and it "looked at drug recalls."[22]

---

[11] ROA.1526-27.

[12] ROA.1526.

[13] ROA.1527.

[14] ROA.1681.

[15] ROA.1528.

[16] ROA.1681.

[17] ROA.1528

[18] ROA.1681.

[19] ROA.1681.

[20] ROA.1682.

[21] ROA.1528.

[22] ROA.1528.

No. 24-11032

Four of the individuals transferred from Surgicare during the summer of 2022 are involved here.[23]  First is TY,[24] a 56-year-old female who went to Surgicare on August 4, 2022 "for liposuction of her back and of her face," a four or five-hour outpatient surgery.[25]  TY was transferred to a hospital mid-surgery,[26] and spent four nights in the ICU and an additional night in a regular room.[27]  Second is JE, a 78-year-old male who underwent surgery on August 9, 2022 for a broken wrist.[28]  JE ended was transferred to the ICU for "four or five days" and then in "assisted living" "for about a month."[29]  Third is KP, a 54-year-old female who underwent a follow-up surgery on August 19, 2022 to cauterize blood vessels.[30]  KP spent five days in the hospital.[31]  Fourth is JA, an 18-year-old male who had surgery to repair his broken nose on August 24, 2022.[32]  JA did not wake up from surgery until a day later,[33] remained in the hospital for a week and a half,[34] and during that

_____

[23] ROA.57-58. A recovered tainted IV bag forms the basis of the remaining two counts of the Government's indictment.

[24] This opinion uses initials to protect the privacy interests of patients and another doctor who was involved.

[25] ROA.2391; *see* ROA.1481-83.

[26] *See* ROA.1483.

[27] ROA.1484.

[28] ROA.2095-2100, 2400.

[29] ROA.2100.

[30] ROA.1770-72.

[31] ROA.1772-73 (admitted to Surgicare on a Friday and transferred to hospital); ROA.1776 (left hospital on the following Tuesday).

[32] ROA.1852-53.

[33] ROA.1854.

[34] ROA.1856-57.

time, underwent a second surgery to repair his broken nose since his physician was unable to repair it during the first surgery.[35]

These individuals were all transferred in August 2022,[36] and were the last four emergency transfers of the fourteen that occurred during the summer of 2022. All four individuals experienced a blood-pressure spike,[37] a blood-pressure tank,[38] and cardiac dysfunction that could not be attributed to a true heart attack.[39]

In addition to these patients, an anesthesiologist who performed services at Surgicare, Dr. MK,[40] died under suspicious circumstances. When Dr. MK arrived at home from working at Surgicare on June 21, 2022, she started an IV in her arm with an IV bag attached.[41] Dr. MK was attempting to hydrate due to an ongoing sickness,[42] but after she began the IV,[43] she started experiencing pain in her arm and chest and called her husband on the phone screaming.[44] She lost consciousness and died shortly after her husband arrived to help her.[45]

---

[35] ROA.1855-56.

[36] *See supra* notes 24-32 and corresponding text.

[37] ROA.2391 (TY), ROA.2404 (JE), ROA.2409 (KP), ROA.2415 (JA).

[38] ROA.2391 (TY), ROA.2406 (JE), ROA.2409 (KP), ROA.2416 (JA).

[39] ROA.2394 (TY), 2404-07 (JE), 2414 (KP), ROA.2417 (JA).

[40] ROA.56.

[41] ROA.1713-14.

[42] ROA.1713-14.

[43] ROA.1717.

[44] ROA.1717-19.

[45] ROA.1718-19.

No. 24-11032

## A

Surgicare identified tainted IV bags as a possible source of the complications. Nurses at Surgicare administer a first IV bag to patients in the pre-operation (pre-op) area.[46] These bags are retrieved from "the blue cart."[47] Surgeries that are longer in duration may require a second IV bag, which is administered in the OR during surgery.[48] This second IV bag is retrieved from a warmer located in the hallway of the OR suite; the warmer keeps the fluid warm so that it does not affect the body temperature of the patient.[49] The IV warmer holds 32 to 34 IV bags at a time,[50] and each IV bag contains an exterior wrapper[51] that includes the date on which the bag "expire[s]"[52] and should no longer be used.[53] An IV bag could be stored in the warmer for up to two weeks.[54]

Usually, Rumaldo Gonzalez, Surgicare's anesthesiologist tech, stocked and rotated the IV bags in the warmer, except when he was on vacation or in the OR assisting with a procedure. Gonzalez "ma[d]e

---

[46] ROA.1991-92; *see* ROA.1505-06, 1825.

[47] ROA.1505-06.

[48] ROA.1825.

[49] ROA.1825.

[50] ROA.1792.

[51] *See* ROA.1558, 1594, 1598.

[52] *See* ROA.1791.

[53] *See* ROA.1571 ("Q: And I think on direct you said that they wrote the date that it was going in, but I think you misspoke . . . . A: You know what, you're right . . . . Q: Okay. So the date that would have been put on [the bag] would have been 14 days out from whenever it was put in the warmer? A: Yes."); *but see* ROA.1546, 1562.

[54] ROA.1570.

6

No. 24-11032

sure . . . they . . . use[d] [the old bags] first,"[55] and "sometimes the stack [of IV bags] gets messy [and] has to be rearranged."[56] Gonzalez also put unused IV bags left in the OR suite back in the warmer.[57]

Aside from dating the IV bags for expiration, Surgicare did not track the IV bags "in any way,"[58] such as by numbering the bags or using a written log.[59] Surgicare did, however, have video surveillance in the hallway recording people placing bags in, and removing bags from, the warmer.[60] Other than the video surveillance, there is "no way to know which specific bag goes in and which specific bag comes out."[61] Since Gonzalez sometimes rotated the bags, "one bag go[ing] in doesn't [necessarily] mean it's the same bag that comes out next."[62]

## B

Dr. Marsden, an anesthesiologist at Surgicare, was the first to question whether the IV bags were causing the numerous emergency complications. Dr. Marsden was the anesthesiologist for KP's procedure,[63] and afterwards, he "kept . . . trying to make sense of what [he] observed"[64]

---

[55] ROA.1797.

[56] ROA.1582.

[57] ROA.1794-96.

[58] ROA.1582.

[59] *See* ROA.1582.

[60] ROA.1528-30; ROA.1532; *see* ROA.1437 (stating the warmer is in the OR suite hallway); ROA.1501 & ROA.1506-08 (discussing where the cameras are).

[61] ROA.1582-83.

[62] ROA.1583.

[63] ROA.1989, 2018.

[64] ROA.2044.

during her surgery.  He eventually concluded that "everything [he] observed [could] be explained by [extraneous] epinephrine in an IV bag."[65]  Some local anesthetics may be "purposefully" administered "intravenously and that's safe for some drugs and safe in certain quantities."[66]  "But all local anesthetics can be toxic if given in large enough quantities,"[67] and when improperly or unknowingly intravenously administered.[68]

Wanting to confirm his theory, Dr. Marsden asked Surgicare's administrator, Ashley Burks, if he could examine Surgicare's records.[69]  He visited Surgicare on the day of JA's surgery—the last of the four procedures at issue here—arriving when JA began experiencing serious complications.[70]  Dr. Marsden went into JA's OR and instructed the physicians and nurses to remove JA's IV bag and replace it with a new one (due to his suspicions about tainted IV bags).[71]  After JA was transported out of the OR, Dr. Marsden "asked everybody . . . [not to] take anything out of [the] room" and to

---

[65] ROA.2044-45.

[66] ROA.2566.

[67] ROA.2566.

[68] *See* ROA.1514 ("[A] local dose of too much [bupivacaine] can lead to related toxicity."); ROA.1652; ROA.1658; ROA.1751 ("Lidocaine, as with all local anesthetics, can have systemic toxicity."); ROA.1914-16 (explaining that "some ways" the "safe dosage sometimes accidentally gets exceeded is if the medication or the infusion that's intended to go into a space accidentally goes into a vein"); ROA.2336-37; ROA.2376-77 (stating that epinephrine, when "inadvertently" given "through the IV," could cause "individuals [to] develop huge blood pressure spikes and huge heart rate spikes"); ROA.2385-90; *see also* ROA.2390 ("local anesthetics if they get absorbed intravenously will have neurotoxicity . . . . There is a substantial risk of death when lidocaine or bupivacaine are injected intravenously.").

[69] ROA.2045.

[70] ROA.1889-90; *see* ROA.2046.

[71] ROA.2047-48.

"gather up any IV bags or the wrappers that are on the outside of an IV bag."[72]  In the process, Dr. Marsden "found a wrapper . . . right on top of the anesthesia cart trash can that [is] connected to the anesthesiologist's cart"[73] "with a hole in it."[74]  The hole appeared to have been made by a needle[75] in the part of the exterior wrapper that is above the IV bag's injection port, which would have allowed a local anesthetic or epinephrine to be inserted into the IV bag without leaving a hole in the IV bag itself due to its self-healing septum.[76]

The Government learned of Dr. Marsden's findings.  It theorized that Dr. Ortiz used syringes to inject epinephrine, ephedrine, or a local anesthetic (like bupivacaine or lidocaine)[77] into the IV bags, a result that would be undetectable from a visual inspection of the bag because of the bags' self-healing septums, and plausible given the IV bag retrieved after JA's surgery.[78] The Government claimed Dr. Ortiz was responsible for the corrupted IV bag in JA's surgery and posited that all the other emergency complications occurring at Surgicare that summer were due to IV bags he tainted.

A federal grand jury indicted Dr. Ortiz for five counts of tampering with a consumer product in violation of 18 U.S.C. § 1365(a), and five counts

---

[72] ROA.2048.

[73] ROA.2048.

[74] ROA.2049.

[75] *See* ROA.1564-65; ROA.2049; ROA.2258-59.

[76] ROA.1952-53; *see* ROA.2049, 2257-59.

[77] *See* ROA.1514-15, 1652, 1658, 1751, 1914-15, 2336-37, 2376-77, 2385-90; *see also* ROA.2390 ("There is a substantial risk of death when lidocaine or bupivacaine are injected intravenously.").

[78] ROA.1952-53, 2048-49, 2258-59.

No. 24-11032

of adulteration of a drug in violation of 21 U.S.C. §§ 331(k) and 333(b)(7).[79] The incidents involving TY, JE, KP, and JA formed the basis of eight counts in the indictment; an unused, tainted IV bag found in the warmer at Surgicare formed the basis of the remaining two counts. The indictment described Dr. MK's death, but did not charge it as a count.[80]

## C

At the nearly two-week long trial,[81] the jury saw and heard evidence that included:

(1) video footage of Dr. Ortiz handling syringes, vials of medicine, and IV bags on the day of the patients' surgeries;

(2) video footage of Dr. Ortiz's behavior in the vicinity of the IV bag warmer on the day of the patients' surgeries;

(3) a witness demonstrating how to inject an IV bag;

(4) KP's and JA's blood test results showing medication that was not supposed to be there;

(5) IV bag test results indicating evidence of tainting;

(6) testimony from the patients' surgeons and anesthesiologists about the patients' procedures;

(7) expert testimony about tainted IV bags being a cause of the patients' symptoms;

(8) testimony about Dr. MK's death;

---

[79] ROA.59-61.

[80] *See* ROA.56-60.

[81] ROA.17 (Entry #164).

(9) Surgicare and the Texas Medical Board's investigations of Dr. Ortiz; and

(10) Dr. Ortiz's financial difficulties.[82]

## D

After the Government's case in chief, Dr. Ortiz moved for a judgment of acquittal as to all counts,[83] which the court denied.[84] Dr. Ortiz then renewed the motion at the close of evidence,[85] which the court took under advisement[86] and later denied.[87]

The jury convicted Dr. Ortiz on all counts charged in the indictment.[88] Counts one and six were based on IV bags used in TY's surgery on August 4, 2022;[89] counts two and seven were based on IV bags used in JE's surgery on August 9, 2022;[90] counts three and eight were based on IV bags allegedly tampered with on August 16, 2022, and used in JA's surgery on August 24, 2022;[91] counts four and nine were based on IV bags used in KP's surgery on August 19, 2022;[92] counts five and ten were based on bags found in the IV

---

[82] *See infra* Section II.

[83] ROA.2493.

[84] ROA.2494.

[85] ROA.2789.

[86] ROA.2789.

[87] ROA.2887.

[88] ROA.1124-25.

[89] *See* ROA.57, 59-60.

[90] *See* ROA.57, 59-60.

[91] *See* ROA.58-60; ROA.1853; Ortiz Br. at 15.

[92] *See* ROA.57, 59-60.

warmer on August 24 or 25, 2022,[93] but tampered with around August 23, 2022.[94]

Thereafter, the district court considered the guideline calculation, which was the statutory maximum sentence,[95] and it imposed that statutory maximum sentence for each count to run consecutively, resulting in 2,280 months of imprisonment.[96] The district court entered its final judgment,[97] and Dr. Ortiz timely appealed.[98] He challenges the sufficiency of the evidence supporting the jury's verdict, the admission of evidence about Dr. MK's death, Dr. Hail being allowed to testify, and an allegedly improper comment during the Government's closing argument.

## II

Dr. Ortiz contends there was insufficient evidence to support the jury's verdict.[99] We review properly preserved sufficiency challenges de novo.[100] "This review is 'highly deferential to the jury's finding of guilt'"

---

[93] *See* ROA.58-60. The indictment states the tampered bag was found in the warmer "on or about August 25, 2022." *See also* Gov't Videos 60-68 (August 23 video surveillance showing Dr. Ortiz removing two IV bags from the warmer and taking them into OR 5 (Video 60), leaving OR 5 without the bags (Video 65), drawing up medication into syringes in the pre-op room (Video 61) , entering OR 5 with those syringes (Videos 62, 64-67), and leaving OR 5 with an IV bag that he then placed in the warmer (Video 68)).

[94] ROA.59.

[95] ROA.2931-32.

[96] ROA.2931-33; ROA.2933 (240 months for counts one through four and six through ten, to run consecutively to each other; 120 months for count five, to run consecutively to all counts); *see also* ROA.1152.

[97] ROA.1150.

[98] ROA.1149.

[99] Ortiz Br. at 31.

[100] *United States v. Martinez*, 131 F.4th 294, 308 (5th Cir. 2025) ("Where a defendant properly preserves a sufficiency challenge, as [the defendant] did here by moving

and "[t]he jury can 'choose among reasonable constructions of the evidence.'"[101] We "must accept the jury's credibility determinations and reasonable inferences,"[102] with the inquiry being "limited to whether the jury's verdict was reasonable, not whether [the court] believe[s] it to be correct."[103] "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt,"[104] but "'a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference,' or 'an unwarranted inference, the determination of which is a matter of law.'"[105] We "consider the countervailing evidence as well as the evidence that supports the verdict,"[106] and "any conflict in the evidence must be resolved in favor of the jury's verdict."[107] Ultimately, we "will

---

for judgment of acquittal at the close of the government's case and the defense, the court reviews the challenge de novo." (internal citations omitted) (citing *United States v. Davis*, 53 F.4th 833, 842 (5th Cir. 2022))). The Government does not dispute that Dr. Ortiz properly preserved his sufficiency challenge. Gov't Br. at 17-18.

[101] *Martinez*, 131 F.4th at 308 (internal quotations omitted) (quoting *United States v. Capistrano*, 74 F.4th 756, 766 (5th Cir. 2023); *see United States v. Zamora-Salazar*, 860 F.3d 826, 831 (5th Cir. 2017) (stating that the "jury's verdict is afforded 'great deference' on appeal" and that this court's standard of review is "highly deferential"); *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) ("Our review of the sufficiency of the evidence is 'highly deferential to the verdict.'" (quoting *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002))).

[102] *Martinez*, 131 F.4th at 308 (citing *Davis*, 53 F.4th at 842).

[103] *Id.* (quoting *United States v. Oti*, 872 F.3d 678, 686 (5th Cir. 2017)).

[104] *United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999).

[105] *Martinez*, 131 F.4th at 308 (quoting *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018)).

[106] *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) (quoting *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999)).

[107] *Moreno-Gonzalez*, 662 F.3d at 372 (citing *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990)).

uphold the jury's verdict if 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[108]

Under 18 U.S.C. § 1365, which criminalizes tampering with consumer products, and 21 U.S.C. § 331(k), which criminalizes adulteration of a drug, the Government must prove, *inter alia*, that Dr. Ortiz tampered with and adulterated (poisoned) an IV bag corresponding to each count.[109] Dr. Ortiz argues that it is doubtful any of the IV bags referenced in counts one, two, four, five, seven, and eight of the indictment were tainted; these bags align with TY, JE, and KP's surgeries.[110] He contends, however, that even "if the evidence shows that all five bags in the indictment had been tainted, no rational jury could think it proven beyond a reasonable doubt that [he] did the poisoning" because the "government relied primarily on coincidence to identify [him] as the guilty party."[111] He further alleges that the Government's case on every count "depends on a pattern, and doubt that any individual case belongs to the pattern tends to destroy the case on every count."[112]

Dr. Ortiz fails to view the evidence in the light most favorable to the jury's verdict. There was overwhelming evidence from which a reasonable

---

[108] *Martinez*, 131 F.4th at 308 (quoting *United States v. Daniels*, 723 F.3d 562, 569 (5th Cir. 2013), *reh'g granted in part on other grounds*, 729 F.3d 496 (5th Cir. 2013)); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

[109] *See* 18 U.S.C. § 1365; 21 U.S.C. § 331(k).

[110] Ortiz Br. at 34.

[111] Ortiz Br. at 33.

[112] Ortiz Br. at 34.

No. 24-11032

jury could have concluded beyond a reasonable doubt that Dr. Ortiz poisoned each of the IV bags alleged in the indictment.

## A

We start by describing the evidence that is common to all counts. Then, we address evidence unique to individual counts. Finally, after examining all the evidence, we conclude that there was sufficient evidence for the jury to convict Dr. Ortiz on all counts.

## 1

Dr. Ortiz had access to the medical supplies necessary to tamper with and adulterate IV bags: syringes, needles, and drugs such as epinephrine, ephedrine, bupivacaine, and lidocaine.[113]   He also had knowledge as an anesthesiologist that injecting drugs in unopened IV bags could go undetected if injected just above the bag's self-healing septum,[114] and that using drugs such as epinephrine could aid in avoiding detection.[115] Additionally, he had the opportunity: a witness demonstrated injecting an IV bag in eight seconds, suggesting that Dr. Ortiz could have injected IV bags in

---

[113] ROA.1515-17 (testimony describing the supplies on anesthesia carts and that "all the O.R.'s had [carts]," including OR 5, where Dr. Ortiz worked); ROA.1746-47; ROA.2050-51.

[114] *See* ROA.2048-49 (Dr. Marsden, an anesthesiologist, explaining that "somebody [could] mess with a bag and [no one would] know about it because of the wrapper" and that "it wouldn't be that hard to do given the design of [the] bags and the way they're wrapped and the way the injection ports just sit on top."); *see also* ROA.1952-53.

[115] ROA.2383-84 (describing how epinephrine is already "in our body" and that it has a short "half life," meaning that it clears one's bloodstream quickly, which is not the same thing as "duration of effect"); ROA.2385 (explaining that "a consumer product [that] ha[s] been secretly adulterated to contain epinephrine … would [present] a substantial risk of death").

the busy OR suite without staff, who were occupied with their own tasks, growing suspicious.[116]

Video surveillance captured Dr. Ortiz taking multiple IV bags at a time from the warmer[117] when the usual practice was to take only one[118] while he also had syringes in his pockets,[119] drawing up medication into unlabeled ten-milliliter syringes in the pre-op area,[120] with syringes in the hallways near the time he accessed the warmer,[121] putting IV bags into the warmer shortly after handling syringes,[122] checking the warmer after putting IV bags into it,[123] and, on one occasion, after departing from a room with "sharps containers," "spen[ding] a few seconds [at the warmer] doing something with the IV bags."[124]

Dr. Ortiz's privileges and status allowed him to enjoy a default assumption by others that he was handling IV bags, syringes, needles, and vials of medicine properly.  Dr. Ortiz attempts to discredit this evidence and

---

[116] ROA.1698-99.

[117] ROA.1537, 1542, 1826-27; Gov't Videos 15, 42.

[118] *See* ROA.1826.

[119] *See* ROA.1543; Gov't Videos 62, 63; *but see* ROA.2540 (defense witness testifying it is "not uncommon" "for anesthesiologists to walk around with syringes in their front pocket"); ROA.2065 (noting that a Doctor "seemed unbothered" while Dr. Ortiz was "doing his syringes.").

[120] ROA.1543, 2050; *but see* ROA.1542 (hospital administrator testifying that it was "not highly unusual by itself" for Dr. Ortiz to draw up medication in the pre-op area); Gov't Video 32.

[121] ROA.1542-44, 1546-47; Gov't Videos 30, 42.

[122] ROA.1542-44; Gov't Videos 31-33.

[123] ROA.1533; Gov't Video 68; *but see* ROA.1591-93 (other staff (but not doctors) checking the warmer).

[124] ROA.1547; Gov't Videos 41, 42.

No. 24-11032

emphasizes that it is this very evidence—his handling of IV bags, syringes in the pre-op area, and vials of medicine—that the Government argues is suspicious and makes him guilty. However, his actions are suspicious when compared to his job description and standard practices among anesthesiologists, as described below.[125]

**2**

Government witnesses testified that physicians did not usually fill the IV warmer or remove bags from it,[126] and that doing so was not part of Dr. Ortiz's job because it was the anesthesia tech Rumaldo Gonzalez's job.[127] There was also testimony that Dr. Ortiz typically did not help others in completing their tasks,[128] and that checking the warmer was peculiar

---

[125] *See infra* notes 126-135 and accompanying text.

[126] *See* ROA.1437, 1510, 1532, 1796, 2024.

[127] *See* ROA.1510.

[128] ROA.2780-81 (Burks testifying Dr. Ortiz isn't known for doing extra work, and when she worked with him regularly from 2009-2014—doing "hundreds to in the thousands" of procedures with him— she never saw him put away supplies at the end of the surgery); ROA.1796-97 (Gonzalez testifying that it wasn't Ortiz's job to put IV bags in the warmer and that he never helped him with his job, nor told him that the warmer was running low on IV bags); ROA.1835-36 (circulating nurse Brook Buchanon, who worked with Ortiz regularly from March or April 2022 onward, testifying that he did not help clean up the room after and was not "generally helpful"); ROA.2774-78 (Surgical tech Paul Monaco, who worked with Ortiz roughly every Tuesday and Thursday from December 2016 to August 2022, testifying he never observed Ortiz "clean up the OR room," "put supplies away at the end of a procedure," "clean up the IV bags," "offer to help [him] clean up" or "help anybody out with their job"); ROA.2753, 2757, 2765 (defense witness, Dr. Trostel, who did "probably close to a thousand procedures" with Dr. Ortiz, testifying he did not recall Ortiz taking unused IV bags out of the OR room at the end of a procedure).

behavior because he had no reason to check it.[129]    However, defense witnesses testified that Dr. Ortiz often acted outside his job description.[130]

Dr. Ortiz additionally offered evidence of other hospital staff putting bags *into* the IV warmer,[131] but importantly, "staff" did not include anesthesiologists, [132]  only circulating nurses[133] and the anesthesiologist tech whose job it was to put bags into the warmer.[134] Dr. Ortiz offered no evidence that *anesthesiologists* would put bags *into* the warmer.[135]

**3**

There was testimony that the symptoms TY, KP, JA, and JE experienced (a blood pressure spike, blood pressure tank, and cardiac dysfunction without a culprit lesion, which one would see during a heart attack) could be explained by adulterated IV bags.[136]  The symptoms each

---

[129] *See* ROA.1510, 1796-97, 2777.

[130] *See, e.g.*, ROA.2531 (starting an IV for a patient in preop if the preop nurse is having a hard time); ROA.2531 (cleaning the OR); ROA.2532 (putting up supplies at the end of a procedure); ROA.2532-53 (hooking up patients to their monitors).

[131] ROA.1584-89.

[132] ROA.1748 (Anesthesiologist Dr. Erdman testifying he never put an IV bag in a warmer in his 40-year career); ROA.1954 (Anesthesiologist Dr. Hussain testifying he never put an IV bag in the warmer).

[133] ROA.1584-89 (noting Erin Rossman, a circulator, putting a bag into the warmer; noting Granville McMullin, a circulator, putting a bag into the warmer; noting Rumaldo Gonzalez putting a bag into the warmer; noting Kendra Bays, a circulator, putting a bag into the warmer; Claudi, a circulator who worked as needed, putting a bag into the warmer).

[134] ROA.1792, 1797; *see* ROA.1509 ("[W]e typically have one person, Rumaldo Gonzalez, who would stock the warmer.").

[135] ROA.1589-91.

[136] ROA.2399 ("So the pattern in all of these patients is very important, because it starts with a blood pressure spike, then the blood pressure tanks, then there's pulmonary edema, there's . . . positive troponins and there are signs of cardiac dysfunction. So those are the five things that have happened in all of these patients."); *see also, e.g.*, ROA.1734

No. 24-11032

experienced were the same, yet they were different ages and genders, had different medical histories and medical providers, and were undergoing different medical procedures. The Government also presented testimony from the patients' surgeons and anesthesiologists, and they largely agreed that no pre-existing conditions of the four individuals involved here, nor anything the physicians did in the surgeries, were the reason for the emergency complications.[137] The Government's anesthesia expert, Dr. Hail, agreed with the surgeons and anesthesiologists and further opined that the complications did not result from accidental infiltration of subcutaneous injections into the vein.[138] Dr. Hail ultimately concluded that the

---

(TY blood pressure spike) ("[A]t some point during the procedure there was a sudden change in the patient's heart rate and blood pressure that attracted my immediate attention because it was a very rapid and extreme rise."); ROA.2391 (TY blood pressure tank); ROA.2394-97 (describing TY's cardiac dysfunction without culprit lesion); ROA.2397-99 (Dr. Hail testifying that TY's symptoms were consistent with an IV bag tainted with epinephrine and bupivacaine and affirming that her conclusion "after eliminating all the other causes [was] that the IV bag caused these issues"); ROA.1741, 1745 (Dr. Erdman testifying that TY's blood pressure spike could be consistent with infusion of epinephrine).

[137] *See, e.g.*, ROA.1739-41 (Dr. Erdman, TY's anesthesiologist, testifying that none of the drugs he gave her, nor her underlying medical conditions caused the event); ROA.2397 (Dr. Hail, after reviewing TY's medical records, testified that "[t]here was no underlying cause that was found"); ROA.1527-28 (Administrator Burke testifying that multiple physicians reviewed the transfer cases and could not determine what was happening); 1908-09 (JA's physician testifying that no preexisting conditions, medications administered, or improper errors during the surgery caused the event).

[138] *See* ROA.2419-20 ("Q: . . . So what are the commonalities between these four events? A: So blood pressure spike, blood pressure tank, pulmonary edema, positive troponins and some degree of cardiac dysfunction. Q: But none of these people had heart attacks? A: Correct. Q: They all had some other event happen to them? A: Yes."); ROA.2470 ("[D]uring these surgeries rather other than the IV bags, was there any indication that there was any improper surgical techniques used or any improper injections of these types of medications? A. No, there was no indication.").

emergencies resulted from intravenous injection of local anesthetics, epinephrine, or ephedrine in toxic amounts.[139]

Dr. Ortiz's expert countered that there could be other reasons for the patients' complications: COVID, pre-existing conditions, side effects of intentionally-administered drugs, and infiltration of the veins by subcutaneous injections of anesthesia.[140]  However, the Government offered evidence that the patients' complications could not be explained by underlying medical conditions or medical errors, and "any conflict in the evidence must be resolved in favor of the jury's verdict."[141]

**4**

There was evidence of tainted IV bags in the warmer near the time of TY, KP, JA, and JE's surgeries.  Professor Verbek's lab examined two unused IV bags and discovered stereoscopic evidence of possible holes in

---

[139] ROA.2397 ("My conclusion was that that initial blood pressure spike was consistent with what you would see with epinephrine and epinephrine intravenously."); ROA.2407-08 ("My overall conclusion was that that initial blood pressure spike is consistent with epinephrine, and then the blood pressure tanking is consistent with epinephrine being turned off or wearing off, consistent with antihypertensives that were administered, and consistent with lidocaine or bupivacaine causing cardiac dysfunction."); ROA.2413-14 ("So I concluded that [KP's] blood pressure spike is consistent with epinephrine. And then her blood pressure tanked, which is consistent with epinephrine wearing off or being turned off with antihypertensives that were administered and the effects of a local anesthetic like bupivacaine."); ROA.2419 ("So what was your overall conclusion about what happened to [JA]? A: So the initial blood pressure spike is consistent with epinephrine. It actually is also consistent with ephedrine. And then he had his blood pressure tank, which is consistent with . . . epinephrine wearing off or being turned off with the administration of multi antihypertensive medications and also consistent with a local anesthetic.").

[140] *See* ROA.2612-13, 2616-20, 2622-39.

[141] *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (citing *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990)).

their wrappers. [142] His lab also tested the bags' fluid and concluded that the bags contained bupivacaine, epinephrine, and lidocaine.[143] These bags were found in the IV warmer on August 24, 2022,[144] and each of the individual's surgeries took place between August 4 and August 24.[145]

Dr. Ortiz's expert challenged the reliability of Professor Verbek's findings, stating that the data did not "reliability indicate" that the IV bags contained bupivacaine, lidocaine, and epinephrine.[146] However, credibility determinations are for the jury.

In addition to the evidence from Professor Verbek's lab, Baxter Healthcare, the IV bags' manufacturer, conducted an investigation and "rule[d] out manufacturing as a potential root cause"[147] of the contamination of the IV bags.

**5**

There was testimony that the emergencies correlated with Dr. Ortiz's presence at Surgicare—pausing for one week when he was on vacation and stopping completely when he was no longer working there.[148]

---

[142] ROA.9897, 9899.

[143] ROA.2276-77; ROA.2281 *see* Ortiz Br. at 14.

[144] ROA.1554-61, 2246-47, 2257-58.

[145] ROA.2390; ROA.2095-2100; ROA.1770-72; ROA.1852-53.

[146] ROA.2709-10. She explained that the presence of the chemicals reflected "consumables" burned off from the testing machines, which could result in false positives. *See* ROA.2713. She further reasoned that if Professor Verbek had a "cutoff level," such false positives would not occur. *See* ROA.2715.

[147] ROA.1982.

[148] ROA.1444-45; ROA.1566-67.

No. 24-11032

**6**

The Government submitted video surveillance evidence from which a reasonable jury could have concluded Dr. Ortiz had a guilty conscience.[149] The Government also presented evidence that Dr. Ortiz did not typically take IV bags from the warmer for use during his surgeries until the summer of 2022.[150] He also commenced putting more than one bag on the ventilator in the OR where he worked.[151] The jury could have reasonably inferred that Dr. Ortiz retrieved his own IV bags because he knew some in the warmer were tainted and did not want to risk medical emergencies during his operations.

**7**

There was evidence that Dr. Ortiz had motive because he was financially and professionally struggling.[152] The jury heard evidence that:

> (1) Surgicare was investigating Dr. Ortiz during the 2022 summer for an incident that took place at Surgicare in May 2022;[153]

---

[149] *See* ROA.1537-39, 1548; Gov't Videos 3-5, 16, 47, 68 (showing Dr. Ortiz looking around before placing a bag into the warmer, checking the warmer after placing a bag into the warmer, and waiting for the area around the warmer to clear before looking inside the warmer); *see United States v. Lage*, 183 F.3d 374, 383 (5th Cir. 1999) ("[F]actfinders may properly 'use their common sense' and 'evaluate the facts in light of the natural tendencies and inclinations of human beings.'" (quoting *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989)).

[150] ROA.1826-27.

[151] ROA.1827.

[152] ROA.2154-55, 2174, 2192-94.

[153] ROA.1438-40, 1523-25, 1828, 2120-21.

(2) some of the emergency complications occurring that summer were within one or two days of the meetings at which Surgicare discussed that May 2022 incident;[154]

(3) Dr. Ortiz had been under investigation at another Surgicare location around that time, but resigned his privileges before that investigation concluded;[155]

(4) Dr. Ortiz was on notice that the Texas Medical Board was investigating him during the summer of 2022 for a November 2020 incident;[156]

(5) the agreed settlement with the Texas Medical Board to resolve the 2020 incident required monitoring of Dr. Ortiz's practices and was set to take effect August 19, 2022;[157]

(6) the Texas Medical Board had already investigated Dr. Ortiz prior to the November 2020 incident, and the agreed settlement for that investigation included a public reprimand;[158]

(7) Dr. Ortiz's income was decreasing;[159]

(8) Dr. Ortiz owed "maybe 3 million" in taxes;[160] and

---

[154] ROA.1693-95.

[155] ROA.1524, 2122.

[156] ROA.1473.

[157] ROA.1473-75.

[158] ROA.1470-73.

[159] ROA.2174.

[160] ROA.2194.

(9) one of Dr. Ortiz's companies was struggling to make payroll during the 2022 summer.[161]

The medical emergencies at Surgicare began after Surgicare started investigating him for the May 2022 incident—with some emergencies occurring on days surrounding Surgicare's meetings discussing Dr. Ortiz and around the time when his settlement with the Texas Medical Board was to take effect.[162]  The emergencies ended when he no longer practiced at Surgicare.  It is conceivable that Ortiz thought medical emergencies occurring at Surgicare could divert further investigation of him to investigating the reasons for the emergency complications.[163]

Dr. Ortiz responds that evidence of such motive is "conjectural and incoherent" since Dr. Ortiz would have lost even more income if Surgicare had been closed, which would have been "the most predictable consequence of unexplained ER transfers."[164]  But it would have been reasonable for the jury to conclude that Dr. Ortiz sought to focus Surgicare's attention on emergencies, rather than investigating him.

## B

We turn to evidence specific to each individual count.

## 1

We first address the evidence specific to counts one and six—TY's surgery.  Dr. Ortiz argues that counts one and six are based entirely on TY's symptoms, which he claims have explanations other than a tainted IV bag.

_____

[161] ROA.2192-93.

[162] ROA.1473-74; *see e.g.*, ROA.1694-95.

[163] *See* ROA.1526-28.

[164] Ortiz Br. at 44.

No. 24-11032

Specifically, he argues that TY's symptoms can be explained by her surgeon (1) accidentally permitting local anesthesia to enter the bloodstream when applying tumescent subcutaneously[165] or (2) accidentally affixing a tumescent bag to her IV instead of one containing pure saline.[166] Dr. Ortiz also contends that there is no scientific testing to establish TY had foreign chemicals in her blood, there was no testing of TY's IV bags, and no IV wrapper with needle marks was recovered from TY's surgery (i.e., no direct evidence).[167]

**i**

The Government presented evidence that TY's symptoms were consistent with a tainted (poisoned) IV bag. Dr. Erdman, TY's anesthesiologist, testified that TY's blood-pressure spike started within minutes after an IV bag from the warmer was hung, and that he had never seen anything like what happened to TY in his forty years of practice, except in one other suspected poison case that summer.[168] Dr. Erdman additionally stated that the local anesthetic TY's surgeon used to provide numbness along the incision in the facelift part of her surgery was not given in the range of doses that could cause systemic toxicity, so that could not explain her blood pressure spike.[169] TY testified that her surgeon informed her that her blood

---

[165] There is a phenomenon known as "LAST" (local anesthetic systemic toxicity) that accounts for "the toxic effects of local anesthetics if they get absorbed into . . . one's bloodstream." ROA.2566. "[A]ll local anesthetics can be toxic if given in large enough quantities or given even in a small quantity directly into, for example, [one's] carotid artery . . . ." ROA.2566-67. "LAST" is something that can occur "in procedures that use tumescent fluids." ROA.2567.

[166] Ortiz Br. at 46.

[167] Ortiz Br. at 46.

[168] ROA.1738-39; ROA.1745-46.

[169] ROA.1751, 1765.

pressure and heart rate went up quickly after the new IV bag was administered.[170]  Toxicologist expert Dr. Hail testified that TY's blood-pressure spike coincided with the second IV bag being hung.[171]

The Government presented testimony refuting Dr. Ortiz's first explanation for TY's symptoms—that the use of tumescent during the liposuction portion of her surgery caused her blood-pressure spike.  Dr. Erdman testified that the use of tumescent could not "have explained [her] spike in blood pressure."[172]  Other witnesses expounded, stating that tumescent solution contains a diluted concentration of local anesthetic and epinephrine,[173] is put into fatty tissue, which does not have good blood flow making it less likely to enter the bloodstream,[174] and is eventually removed from the body during the liposuction.  Witnesses also explained that even if it was absorbed into the blood stream, local anesthetic, when properly administered, causes blood pressure to drop, not rise.[175]

Dr. Ortiz points to the testimony of TY's surgeon, Dr. Kerner, who testified that the subcutaneous injections "could have" "contribute[d] to [her] blood pressure issues" "because [she] was putting in . . . tumescent[, which] has lidocaine and epinephrine," and "[t]hat would be the most likely

_____

[170] ROA.1492.

[171] ROA.2392.

[172] ROA.1765-66, 2785-86.

[173] ROA.1461, 1464-65, 2022.

[174] ROA.2022 (testifying that "fat does not have great blood flow . . . [s]o when that medication is put in, it kind of just sits there, numbs up any pain fibers in the area" and that "[i]n order for a local anesthetic to cause toxicity or be a problem it has to be absorbed into the blood system, carried to the heart, carried to the brain"); ROA.2335-38.

[175] ROA.2472-73; see ROA.2566-67 (explaining that some local anesthetics are administered intravenously "purposefully" and that doing so is "safe for *some* drugs and . . . in *certain* quantities" (emphasis added)).

cause."[176]    However, the jury could have concluded Dr. Kerner was not credible or believed other, contradictory testimony.  The jury had reason to doubt Dr. Kerner's credibility as, originally, she did not remember the rise in TY's blood pressure during the surgery—she "blanked."[177]  Then, after counsel asked if the surgical procedures contributed to TY's blood pressure issues, she answered "[t]hey could have."[178]  Further, Dr. Kerner testified on cross-examination that tumescent inadvertently intravenously injected (i.e., hooking up a tumescent bag to TY's IV) could account for TY's high blood pressure incident, but she stated she did not inject tumescent intravenously inadvertently, explaining away this potential cause.[179]  She also stated that the treating of blood pressure is "in the wheelhouse of the anesthesiologist,"[180] and Dr. Erdman, the anesthesiologist, testified that Dr. Kerner's use of tumescent could not explain TY's blood pressure spike.[181]

The Government presented evidence refuting Dr. Ortiz's second explanation for TY's symptoms—accidentally affixing a tumescent bag to her IV.  The IV warmer contained normal IV bags and IV bags comprised of tumescent fluid.[182]  Bags of tumescent fluid contain IV solution, lidocaine,

_____

[176] ROA.2345.

[177] ROA.2343-45.  After this witness testified, there was "serious concern" that she was "experiencing a medical episode."  ROA.2380.  She couldn't "find her keys" or "recall what happened in the courtroom."  ROA.2380.  "She was extraordinarily disoriented when she got off the stand" and "was taken by emergency ambulance to the hospital."  ROA.2434.  The jury did not know this, though.  Ortiz Br. at 22.

[178] ROA.2343-45.

[179] ROA.2359, 2367-68.

[180] ROA.2362.

[181] ROA.1765-66.

[182] ROA.1576-77, 1700-01.

and epinephrine,[183] and are used during liposuctions to loosen up tissue, tighten the skin, and stop bleeding.[184]  Tumescent fluid is injected subcutaneously—it is injected "through all the layers of the fat . . . right on top of the muscle to right underneath . . . the skin,"[185] whereas normal IV solution is injected intravenously—into the vein.  It would be "very bad" if tumescent fluid was injected intravenously.[186]  A bag containing tumescent fluid was marked with an orange sticker or a "biohazard sticker," and did not contain an exterior wrapper like the IV bags.[187]

Although these bags were in the same warmer as the IV bags, Surgicare's administrator, Ashley Burks,[188] testified that, in addition to their distinct labeling, the bags with tumescent "were not mixed in . . . with the other IV bags."[189]  The tumescent bags went "on the bottom shelf."[190]  Her testimony suggested it would be difficult to accidentally use such a bag, especially in light of the nurses, surgeon, and anesthesiologist assisting with the procedure.

Additionally, toxicologist expert Dr. Hail stated that his "conclusion . . . after eliminating all the other causes is that the IV bag caused [her] issues . . . [a]nd that [her] poisoning was consistent with both

---

[183] ROA.2336-39.

[184] ROA.2338.

[185] ROA.2336.

[186] ROA.2336.

[187] ROA.1576-77, 1700-01, 1810, 1814.

[188] ROA.1494, 1496.

[189] ROA.1701.

[190] ROA.1701.

epinephrine and a local anesthetic toxicity."[191]    Administrator Burks corroborated this testimony, attesting that Surgicare's root-cause analysis did not reveal any medical errors[192] (directly refuting Dr. Ortiz's arguments that TY's surgeon "accidentally" erred).

From the foregoing evidence, a rational jury could conclude that someone poisoned TY's IV bag.  That accordingly leaves the question of whether a rational jury could conclude that Dr. Ortiz poisoned TY's IV bag.

**ii**

The video footage showed to the jury revealed that a few hours before TY's surgery, Dr. Ortiz took a vial of medicine from the OR hallway cabinet, and at the same time grabbed an IV bag.[193]  About thirty minutes before TY's surgery, and a few hours after taking the vial of medicine and IV bag, Dr. Ortiz placed an IV bag in the warmer.[194]  No one else accessed the warmer between his placing the IV bag in the warmer and a circulating nurse from TY's surgery taking an IV bag for TY's procedure.[195]  The video footage demonstrated Dr. Ortiz looking around suspiciously when placing the IV bag in the warmer, and checking the warmer twice before the nurse took the IV bag for TY.[196]  Moreover, the video footage showed Dr. Ortiz asking multiple people about TY's complications and watching as she was taken out on a stretcher.[197]

_____

[191] ROA.2399.

[192] ROA.1700.

[193] ROA.1530; Gov't Video 10.

[194] ROA.1530-34; Gov't Video 6 at 00:01-10 & 35:26-35:35.

[195] ROA.1530-34.

[196] ROA.1530-34; Gov't Video 6 at 00:01-10 & 35:26-35:35; Gov't Videos 4 & 5.

[197] ROA.1536; Gov't Video 1.

The Government's brief includes screenshots from this video footage. Since these screenshots were not presented to the jury, we do not consider them.

The evidence is sufficient for a jury to conclude that the bag Dr. Ortiz placed in the warmer was the same bag used in TY's surgery. Accordingly, there was sufficient evidence on counts one and six.

**2**

We next address counts two and seven—JE's surgery. As with TY, Dr. Ortiz argues that the only evidence the Government presented of JE's poisoning was symptoms, which Dr. Ortiz claims can be otherwise explained.[198] He emphasizes that there was no scientific testing of the IV's bags used in this procedure, nor testing of JE's blood.[199] Dr. Ortiz also points to testimony about the timing of JE's blood pressure issues,[200] and calls attention to JE's other conditions, including coronary heart disease, atrial fibrillation managed by a device, and a positive COVID test taken while staying in the ICU after his surgery.[201]

**i**

Regarding the timing of JE's blood pressure issues, Dr. Ortiz emphasizes that JE's blood pressure and heart rate came down while receiving fluid from the alleged poisoned bag, and that his blood pressure spiked while on the first IV bag he received from the pre-op room. He points to the written anesthesia record, demonstrating that JE's blood pressure rose

_____

[198] Ortiz Br. at 48.

[199] Ortiz Br. at 48.

[200] Ortiz Br. at 48-49.

[201] Ortiz Br. at 49; *see* ROA.2148-49, 2622.

*before* a new bag was applied, and an expert witness's testimony that this report, as "charted in a vacuum" made it "appear[]" that his blood pressure started spiking before he received the alleged tainted IV bag.[202]  However, there was testimony that the anesthesia record is "a handwritten record [that is] not perfect," that JE's record was not finished when he was first sent to the hospital but was completed after the fact,[203] and that what is most important "in the documentation of IV fluids is how much fluid is being given, not exactly when."[204]  The written report showed that the second bag was administered around 11:30 a.m.,[205] but the evidence showed that JE was already being transported to the hospital at 11:30 a.m.[206]  JE's surgeon, Dr. Vo, testified that the hypertensive event happened at the very end of JE's surgery, around when the new IV bag was hung,[207] and the video footage showed Dr. Billman, JE's anesthesiologist, retrieving an IV bag from the warmer at 10:54 a.m., with hospital staff rushing to JE's OR about ten minutes later (around 11:04 a.m.).[208]

Toxicologist expert Dr. Hail testified that JE's blood-pressure tank was consistent with epinephrine wearing off and/or local anesthetic in the IV bag, such as lidocaine or bupivacaine.[209]  In other words, JE's decrease in blood pressure while the second bag was attached could have been attributed

---

[202] ROA.2403, 2443.

[203] *See* ROA.2474-75.

[204] ROA.2403-04.

[205] ROA.2476.

[206] ROA.2476; *see* ROA.2404.

[207] ROA.2114-17.

[208] ROA.2114-17; Gov't Videos 18, 20.

[209] ROA.2407-08.

to either the blood-pressure reducing medications Dr. Billman administered to respond to JE's blood-pressure spike or local anesthetic in the IV bag.[210]

Regarding Dr. Ortiz's argument about JE's health conditions, the Government presented evidence that JE's complications could not be attributed to his underlying health conditions. Dr. Vo testified that he had never seen something like JE's episode before or after the summer of 2022,[211] which was corroborated by other medical professionals.[212] Specifically, Dr. Vo attested that no medications, surgical techniques, or underlying health conditions could have caused JE's complications.[213] Dr. Hail corroborated Dr. Vo's testimony by reviewing and analyzing medical records from the physicians who treated JE at the transferee hospital, confirming that JE's complications were not from his underlying health conditions.[214] Dr. Hail also testified that JE's positive COVID test after surgery could not have caused his blood-pressure spike.[215] Dr. Hail further testified that JE's blood-pressure spike was consistent with epinephrine, and that his cardiac dysfunction was consistent with lidocaine or bupivacaine, supporting the Government's theory that JE's IV bag was tainted.[216]

There is sufficient evidence for a jury to conclude that JE's bag was poisoned. But we must also consider whether Dr. Ortiz was the poisoner.

_____

[210] ROA.2407-08.

[211] ROA.2117.

[212] ROA.1436-37, 1444, 1525-26.

[213] ROA.2118-19.

[214] ROA.2407.

[215] ROA.2453.

[216] ROA.2407-08.

No. 24-11032

**ii**

The Government played video surveillance footage showing Dr. Ortiz placing a bag into the warmer before JE's surgery, and Dr. Billman taking a bag out for use in JE's surgery, with no one else accessing the warmer in between.[217] The video showed Dr. Ortiz at 8:00 a.m. taking three IV bags out of the warmer (when the normal practice was to take one)[218] and going into OR 5.[219] About two and half hours later, at 10:19 a.m., Dr. Ortiz left OR 5 with one IV bag and, walking briskly, placed that bag into the warmer.[220] Dr. Billman retrieved an IV bag for JE's surgery about thirty minutes after Dr. Ortiz placed a bag into the warmer.[221] Around the same time that Dr. Billman retrieved an IV bag from the warmer, Dr. Ortiz was in the pre-op area, looking around, and he appears to have eventually asked for an IV bag from the blue cart,[222] suggesting he did not want to use an IV bag from the warmer. Additionally, Dr. Ortiz observed JE while he was taken out on a stretcher to be transported to a different hospital due to his complications.[223] Dr. Ortiz

---

[217] ROA.1537-38.

[218] *See* ROA.1537, 1747, 1826, 2529.

[219] Gov't Video 15.

[220] ROA.1537; Gov't Video 16.

[221] ROA.1538; Gov't Video 18.

[222] ROA.1539; Gov't Video 19.

[223] ROA.1541; Gov't Video 22.

then remained in the hallway for some time after JE was transported, staring in the direction where JE had passed.[224]

Concluding that Dr. Ortiz poisoned JE's IV bag is based on circumstantial evidence, which alone is enough to support a conviction.[225] Based on the video evidence, a reasonable jury could infer that Dr. Ortiz placed the same bag in the warmer that Dr. Billman retrieved. A reasonable jury could also infer that, in combination with evidence described above, Dr. Ortiz had a guilty conscience by watching JE leave Surgicare and lingering so long after JE was gone.

When considering the evidence that applies to all counts and the evidence from each individual count with the evidence corresponding specifically to JE, there was sufficient evidence for the jury to convict Dr. Ortiz on counts two and seven.

**3**

We next discuss evidence corresponding to counts three and eight—JA's surgery. Dr. Ortiz argues that it is speculative whether surgeons used an IV bag placed in the warmer on August 16, 2022, in JA's August 24, 2022 surgery.[226]

---

[224] ROA.1541. Gov't Video 22.

[225] *See United States v. Acosta*, 972 F.2d 86, 88 (5th Cir. 1992) ("It is sufficient if the guilt is proved beyond a reasonable doubt by circumstantial evidence alone." (citing *United States v. Ivey*, 949 F.2d 759, 766-67 (5th Cir. 1991))); *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) ("A large part of the defendant's argument on appeal revolves around the proper inferences and weight the jury is permitted to give to circumstantial evidence. With that in mind, it is important to highlight that our case law makes clear that the standard of review for sufficiency of circumstantial evidence is the same as it normally would be for direct evidence.").

[226] Ortiz Br. at 51.

No. 24-11032

The Government presented evidence that JA's hypertensive episode was triggered by the administration of an IV bag taken from the warmer, that his symptoms could not be explained by medications he received or his underlying health condition,[227] and that his symptoms were consistent with the administration of a tainted IV bag.[228]

JA's IV bags and wrappers were collected and examined, and there was a tiny hole in the wrapper from JA's IV bag[229] as well as chemicals (bupivacaine, lidocaine, and epinephrine) in the fluid.[230] This IV bag demonstrated how one could have tainted an IV bag without detection: liquid injection using a needled syringe through the IV bag's self-healing septum.[231] Test results from SWIFS revealed that JA's blood contained the drugs lidocaine and ephedrine,[232] which were not supposed to be there.[233] Although the test results from NMS did not detect lidocaine in his blood, this

_____

[227] ROA.1830-31, 1888, 1935 (hypertensive episode triggered by IV bag from warmer); ROA.1937-46, 2420 (symptoms could not be explained by medications or underlying health condition).

[228] ROA.2419, 2659-60.

[229] ROA.1558, 1561-62, 1952, 2048-49.

[230] ROA.2048, 2273.

[231] ROA.1952 (testimony that one of the bags had a needle mark); ROA.2049 (testimony that someone could "mess with a bag and" it not be detected "because of the wrapper") (testimony that "it wouldn't be that hard to [mess with an IV bag] given the design of [the] bags and the way that they're wrapped and the way the injection ports just sit on top"); ROA.2258-59 ("on suspect bag three" there was a hole near the bottom of the bag "in proximity of the port").

[232] ROA.2207, 2218-22.

[233] *See* ROA.2202-03, 2221, 2417-18.

can be explained by the difference between SWIFS's and NMS's testing method, as described below.[234]

The Government introduced evidence linking Dr. Ortiz to JA's tainted IV bag.  On August 16, 2022, video surveillance captured Dr. Ortiz taking three IV bags out of the warmer at 8:00 a.m. and looking around suspiciously before walking away from the warmer with the bags.[235]  He exited OR 5 at 9:17 a.m., walked down the hallway toward the pre-op room with a syringe in his hand that he put back in his pocket when he encountered someone, walked back to OR 5, and then a minute later went back toward the pre-op room.[236]  This time on his way to the pre-op room, he walked just past the warmer to look through OR 4's door window, and then quickly turned around and looked inside the warmer.[237]  Upon arriving in the pre-op room, he loaded a syringe multiple times with multiple vials, left the pre-op room with a syringe in his front pocket, and about an hour and half later emerged from OR 5 and put an IV bag in the warmer.[238]

The Government offered evidence demonstrating that the expiration date written on JA's IV bag wrapper was consistent with Dr. Ortiz placing an IV bag in the warmer on August 16, eight days before JA's August 24 surgery. The IV bag from JA's surgery was marked with the date "8/28,"[239] meaning that the bag first went into the warmer around August 14.[240]  Dr. Ortiz could

———————————————

[234] *See infra* notes 250-57 and accompanying text.

[235] Gov't Video 29.

[236] Gov't Videos 30-32.

[237] Gov't Video 31.

[238] Gov't Videos 32-33.

[239] ROA.1952.

[240] *See* ROA.1790-91, 1799-1800.

have taken this bag from the warmer on August 16 and then returned it to the warmer on the same day.  The Government accordingly demonstrated that the bag Dr. Ortiz put in the warmer on August 16 could have been used in JA's August 24 surgery.  The Government also presented evidence that the reason the bag Dr. Ortiz placed in the warmer on August 16 was not used sooner (as occurred with the other IV bags at issue) was because Gonzalez rearranged and restocked the warmer with approximately fourteen new bags on August 18, so the bag could have been moved behind older bags.[241]  A rational jury could conclude that Dr. Ortiz adulterated and tampered with JA's IV bag.  There was therefore sufficient evidence for the jury to convict Dr. Ortiz on counts three and eight.

**4**

Counts four and nine pertain to KP's surgery.  Dr. Ortiz argues that, as with TY and JE, no IV bag or wrapper from KP's surgery was tested.[242] He points out that "[q]ualitative testing at [Southwest Institute for Forensic Sciences (SWIFS)] found bupivacaine and lidocaine in KP's blood," but NMS's "quantitative testing . . . came up negative" for those chemicals.[243] Dr. Ortiz also notes that JA's blood showed more than ten times as much ephedrine as KP's blood showed.[244]  Lastly, Dr. Ortiz states that KP's heart rate and blood pressure did not increase until about an hour after receiving the allegedly poisoned IV bag, and he claims the Government has failed to

––––––––––––––––––––––––––

[241] ROA.1678; ROA.1792; Gov't Video 40.

[242] Ortiz Br. at 52.

[243] Ortiz Br. at 52.

[244] Ortiz Br. at 52.

"satisfactorily explain why KP would take an hour to develop symptoms" in comparison with the other patients at issue.[245]

### i

Aside from KP's blood test results, there was evidence that KP was poisoned. Dr. Marsden testified that he was "extremely confused" by what happened, never having experienced the circumstances at issue.[246] KP's treating physicians at the transferee hospital could not explain what happened to her either, and they told KP that they "kept running tests" but did not "know what happened."[247] The Government introduced testimony that these physicians "worked her up more than" TY, JA, and JE, "looking for anything to explain what had happened and they could not find a cause."[248] Dr. Hail testified that KP experienced the same symptoms as TY, JA, and JE, and stated that the "initiating event" was the administration of the IV bag from the warmer.[249]

There was evidence addressing the discrepancy in the testing methods. Testing of KP's blood revealed that ephedrine, bupivacaine, and lidocaine were in her system.[250] Specifically, NMS's chemists found 32 nanograms of ephedrine per milliliter of blood, and SWIFS's chemists found bupivacaine and lidocaine.[251] However, the Government does not concentrate on NMS's detection of ephedrine in KP's blood, but instead

_____

[245] Ortiz Br. at 52-53.

[246] ROA.2037-38, 2041.

[247] ROA.1775-76.

[248] ROA.2411.

[249] ROA.2413-14.

[250] ROA.2206-07, 2222-23, 2226-27.

[251] ROA.2206-07.

focuses on SWIFS's detection of bupivacaine and lidocaine[252] since those drugs were not supposed to be there.[253] Even though NMS's testing did not detect bupivacaine and lidocaine in KP's blood,[254] there was testimony that this could be explained by its testing method—NMS does not report levels below a certain threshold, as it performs *quantitative* testing whereas SWIFS performs *qualitative* testing.[255] Further, SWIFS's chemist testified that she was confident in her test results that bupivacaine and lidocaine were in KP's blood.[256] The jury could have found her credible.[257]

There was evidence that would explain the discrepancy between JA and KP's blood results. KP's blood was tested twelve hours after surgery, and bupivacaine and lidocaine have short half-lives,[258] so it would not be surprising to detect a small amount of bupivacaine and lidocaine many hours after surgery.

---

[252] ROA.2222-23.

[253] *See* ROA.2201, 2413, 8147-224 (explaining that bupivacaine should not have been there because its half-life is 2.7 hours, and any bupivacaine administered in KP's first surgery on August 18 would not have been detectable by the end of the day on August 19, when her blood sample was drawn).

[254] *See* ROA.2219-20.

[255] *See* ROA.2219-20; *see also* ROA.2216-17.

[256] ROA.2221.

[257] *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997) (explaining that this court "accept[s] all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict" (citing *United States v. Jimenez*, 77 F.3d 95, 97 (5th Cir.1996))).

[258] The life of a drug is the rate at which it is metabolized, and half-life means the time by which the concentration of the substance in one's blood decreases by one-half. ROA.2575-76 (explaining that "if a drug has a half life of three hours, for example, then every three hours the drug becomes half of what it was"); *see* ROA.1939, 2413 ("Every three hours bupivacaine cuts in half and half again and half again and it takes five half lives to get to zero."); ROA.8158.

No. 24-11032

There was evidence explaining the timing of KP's hypertensive event. KP's anesthesiologist, Dr. Marsden, testified that KP's blood pressure spiked after the IV bag from the warmer was attached.[259]    Dr. Hail corroborated this testimony, testifying that the triggering event for KP's blood pressure spike was the IV fluid from the bag retrieved from the warmer.[260]   The evidence showed that her blood pressure spiked from 90 to 140 within ten minutes of the IV bag from the warmer being administered,[261] and it continued to rise as Dr. Marsden increased the flow of the IV bag, despite the fluid containing antihypertensive medications.[262]   Dr. Hail explained that KP's gradual rise in blood pressure could be due to the slow drip of the IV bag, and Dr. Marsden testified that he had slowly increased the drip.[263]   From this evidence, a rational jury could conclude that the timeline of KP's symptoms was due to the rate of her IV drip.  Although Dr. Ortiz faults the Government for not "satisfactorily explain[ing]" why KP would take an hour to develop symptoms in comparison with the other patients, he fails to consider that each patient's IV could have been administered at a different drip rate.

A rational jury could conclude KP was poisoned.

**ii**

There was evidence linking Dr. Ortiz to KP's IV bag.  Video surveillance showed Dr. Ortiz taking a bag out of the warmer at 8:22 a.m. on

---

[259] ROA.2031.

[260] ROA.2409, 2414.

[261] ROA.2031; ROA.8125-46.

[262] ROA.2036; *see* ROA.2461.

[263] ROA.2036, 2461.

the day of KP's surgery and going to OR 5 with it.[264]  Two hours later, Dr. Ortiz came out of OR 5 with an IV bag underneath a folder, and he put an IV bag into the warmer before removing another bag that he took to OR 5.[265] About seven minutes after Dr. Ortiz placed a bag in the warmer, Gonzalez, who was assisting with KP's procedure, retrieved a bag from the warmer.[266] Gonzalez gave the bag to Dr. Marsden, who testified that it was cold when he received it,[267] indicating it was recently placed in the warmer.[268]

Dr. Ortiz challenges the credibility of Dr. Marsden's testimony, contending that the point of the IV warmer is not to use "cold" IV bags.[269] However, we view the evidence in the light most favorable to the verdict,[270] and Dr. Marsden explained to the jury that they were "near the last few minutes" of surgery and using a room-temperature bag was "not a medical problem" because "a warm bag is usually for patient comfort" and he did not intend to "giv[e] a lot of [fluid]."[271]

---

[264] Gov't Video 46.

[265] Gov't Video 47.

[266] Gov't Video 49.

[267] ROA.2027-28.

[268] Dr. Ortiz disputes this testimony, contending that Dr. Marsden did not outwardly express concern that it was cold, and that if it was really "cold," Dr. Marsden would not have used the bag.  Ortiz Reply Br. at 8.  But at trial, Dr. Marsden explained that using "a room temperature bag is not a medical problem" when "near the last few minutes of [a] case" because he would not "intend[] on giving a lot of volume."  ROA.2028.

[269] Ortiz Br. at 43-44; *see* ROA.1747-48, 1826, 2529.

[270] *See United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997); *United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) ("Upon a claim of insufficient evidence to support a conviction, we review the evidence, whether direct or circumstantial, and all the inferences reasonably drawn from it, in the light most favorable to the verdict." (citing *United States v. Salazar*, 958 F.2d 1285, 1290-1291 (5th Cir. 1992))).

[271] ROA.2028.

Additionally, there was evidence that Dr. Ortiz had motive on the day of KP's surgery because it was the same day that his settlement with the Texas Medical Board became effective, which required his medical charts to be reviewed by a monitoring physician.[272] A rational jury could conclude that Dr. Ortiz poisoned KP's IV bag.

## 5

Finally, counts five and ten pertain to an adulterated IV bag found in the warmer on August 24, 2022. Dr. Ortiz argues that the jury could not have reasonably inferred that he injected poison into this IV bag because he was "in the close company of another medical professional"[273] when he allegedly injected medication into the bag. He also argues that these two tainted bags are two of a total of six tainted bags (four used, two unused), and that one is unaccounted for since the Government only charged Ortiz with five tainted bags in the indictment.[274]

### i

The Government introduced evidence that two poisoned bags were found in the warmer on August 24, 2022, each of which had a hole in its wrapper and chemicals in its fluid that were not supposed to be there.[275] Video surveillance captured Dr. Ortiz taking two IV bags out of the warmer at 7:54 a.m. on August 23 and taking them to OR 5.[276] At 8:19 a.m., Dr. Ortiz went to the pre-op room with multiple syringes in his front shirt pocket,

---

[272] ROA.1473-76.

[273] Ortiz Br. at 53.

[274] Ortiz Br. at 55; ROA.54-61.

[275] ROA.2254-59, 2275-77.

[276] Gov't Video 60.

walked around until he was alone in a patient bay, pulled medicine vials out of his pant pocket, and started drawing medication into the syringes that were in his shirt pocket.[277] Dr. Marsden testified that this was "bizarre" behavior: "He has multiple syringes in his pocket and he just keeps adding more and more medications, different medications, mixing medications. I can't—I can't explain why that would—what's going on there."[278] He also testified that using a ten-milliliter syringe in the pre-op was "out of the ordinary" since anesthesiologists usually draw up medications in the OR at the anesthesia cart, or if in the pre-op, they use a 3-cc syringe.[279] Dr. Ortiz left the pre-op room with the syringes, gave three small syringes to a nurse anesthetist, and entered OR 5 with the remaining two large syringes.[280] A few minutes after entering OR 5, he left without the syringes in his pocket but was carrying an IV bag, which he placed in the warmer.[281] He spoke to Gonzalez while placing the IV bag in the warmer.[282] He then walked away from the warmer, briefly went around the corner until the hallway cleared, walked back towards the warmer as if to open the door but did not after someone abruptly entered the hallway, waited again until the hallway cleared, opened the warmer, and touched a bag inside.[283]

_____

[277] Gov't Videos 60 and 61.

[278] ROA.2051.

[279] ROA.2050-51.

[280] ROA.2053; Gov't Videos 62-66.

[281] ROA.2056; Gov't Video 68.

[282] Gov't Video 68.

[283] Gov't Video 68.

Dr. Ortiz argues the testimony that a scrub tech was in the OR with him after he entered with the syringes[284] is evidence that he could not have tampered with an IV bag at that time.[285] However, a Government witness demonstrated that injecting an IV bag took eight seconds,[286] and there was testimony that the tech could have been opening and scrubbing materials between surgeries or reading for school.[287] A reasonable jury could have concluded that the tech was not paying attention to Dr. Ortiz in the brief time it would have taken him to inject the bag.

Additionally, the two poisoned bags the Government found contained an expiration date of September 4, meaning the bags were first put into the warmer around August 18.[288] From that, a rational jury could conclude that the tainted IV bag found in the warmer on August 24 was the same one Dr. Ortiz took out of and then returned to the warmer on August 23.

**ii**

There was evidence addressing the allegedly unaccounted for tainted IV bag. Gonzalez took an IV bag from OR 5 and put it into the warmer on Monday, August 22 after the IV bag remained in OR 5 over the weekend.[289] Dr. Ortiz worked in OR 5 on the previous Thursday and Friday and had taken bags from the warmer into OR 5 that were not returned.[290] A rational jury

---

[284] ROA.2062.

[285] *See* Ortiz Br. at 54.

[286] ROA.1565.

[287] ROA.2057, 2486-87.

[288] *See* ROA.2492-93.

[289] ROA.1702; 1794-95; Defense Video 89.

[290] Gov't Videos 42 and 47.

could have found that Dr. Ortiz poisoned one of those bags, which Gonzalez unknowingly returned to the warmer on August 22.

There was sufficient evidence for a rational jury to convict Dr. Ortiz on counts five and ten.

## III

Dr. Ortiz argues that the district court abused its discretion in admitting evidence about Dr. MK's death.  Prior to trial, the Government gave notice of its intent to introduce evidence "potentially relevant to [Federal] [R]ule of [E]vidence 404(b)" regarding "[m]ultiple other cardiac incidents" at Surgicare "and the death of Dr. [MK] in June 2022 due to bupivacaine poisoning."[291]  Dr. Ortiz moved to exclude evidence about Dr. MK's death under Federal Rules of Evidence 104, 403 and 404.[292]  The district court denied the motion,[293] and Dr. MK's husband, John, testified at trial about her death.[294]  He stated that when Dr. MK arrived at home from working at Surgicare,[295] she told him that "she was going to go start an IV bag to see if she couldn't feel any better"[296] since she had been feeling ill since the night before.[297]  He explained that she went to their garage apartment to administer the IV[298] and he stayed in their house to work.[299]  He

---

[291] ROA.486, 490.

[292] ROA.700-02, 715-18.

[293] *See* ROA.700, 1352.

[294] ROA.1709-23.

[295] ROA.1713.

[296] ROA.1714.

[297] ROA.1713-14.

[298] ROA.1714-15.

[299] ROA.1714-15.

said that "she [had] difficulty administering [it] to herself," so she brought the IV bag to him "for [him] to help her."[300] After they connected the IV bag to the needle in her arm, Dr. MK went back to the garage apartment.[301]

Dr. MK called John's cell about "five [or] six minutes"[302] after leaving with the IV bag affixed to her arm, and when he answered, "she was just screaming."[303] He testified that he "sprinted outside and she opened the door [to the apartment] as soon as [he] got to the top of the steps."[304] He said Dr. MK "immediately told [him] to call an ambulance,"[305] and while he was on the phone with the 911 operator, she collapsed.[306]

Prior to calling the ambulance, John said he asked her "'What's going on?' [a]nd she sa[id] 'My arm, my chest.'"[307] He explained that "[a]fter she stopped screaming she . . . mumbled some incoherent" words "and then fell silent."[308] He testified that he performed CPR and that he would "have regrets forever for not yanking the IV bag out of her arm" while performing CPR since she had told him the pain was in her arm and chest.[309]

John additionally testified that Dr. MK worked at more than one facility, and he would "assume . . . every facility where she worked had IV

---

[300] ROA.1715.

[301] ROA.1715-17.

[302] ROA.1723.

[303] ROA.1717.

[304] ROA.1717.

[305] ROA.1717.

[306] ROA.1718.

[307] ROA.1719.

[308] ROA.1718.

[309] *See* ROA.1719.

bags."[310]  He did not see whether she brought an IV bag from Surgicare on the day of her death,[311] but he noted that they had multiple IV bags "on the shelf in the closet."[312]  He also stated that she had administered an IV bag to him "two or three times" and that there were no problems with any of those bags.[313]

Dr. Ortiz argues that the trial court should have excluded evidence of Dr. MK's death because the Government did not show that Dr. Ortiz caused her death (i.e., injected medication into the IV bag she used) to make it admissible under Federal Rule of Evidence 104, and the prejudicial effect of this evidence outweighed the probative value, making it inadmissible under Federal Rules of Evidence 403 and 404(b).[314]  Since this court reviews the "district court's evidentiary rulings for abuse of discretion,"[315] "subject to harmless error analysis,"[316] Dr. Ortiz argues that the Government failed to meet its burden to show harmless error.[317]

## A

---

[310] ROA.1723-24.

[311] ROA.1724-26.

[312] ROA.1728.

[313] ROA.1720; *see also* ROA.1713-14.

[314] Ortiz Br. at 57.

[315] *United States v. Smith*, 804 F.3d 724, 729 (5th Cir. 2015); *see United States v. Cervantes*, 706 F.3d 603, 615 (5th Cir. 2013) ("If a defendant preserves his challenge to the introduction of Rule 404(b) evidence, the district court's decision is reviewed for abuse of discretion, subject to harmless error analysis." (citing *United States v. Girod*, 646 F.3d 304, 318 (5th Cir.2011))).

[316] *Cervantes*, 706 F.3d at 615 (citing *Girod*, 646 F.3d at 318).

[317] Ortiz Br. at 65.

Dr. Ortiz preserved error for the Rule 104, 403, and 404(b) issues. We consider Rules 403 and 404(b) together since Rule 404(b) calls for essentially a two-step test and this test "essentially incorporates Rule 403's balancing test as its second prong."[318]

For Rule 104, Dr. Ortiz preserved error with his pretrial motion to exclude this evidence, which the trial court denied.[319] When a district court denies a pretrial motion to exclude evidence, the pretrial motion to exclude is sufficient to preserve error on appeal.[320] The parties agree that Dr. Ortiz preserved the issue regarding Rules 403 and 404(b).[321]

**B**

Assuming without deciding that the district court erred in admitting the Dr. MK evidence under Rules 104, 403, and 404, we address whether the error was harmful. "If the district court erred in its evidentiary ruling, the

---

[318] *See United States v. Kinchen*, 729 F.3d 466, 473 n.5 (5th Cir. 2013) (recognizing that this court's analysis regarding admissibility of evidence under Rule 404(b) "essentially incorporates Rule 403's balancing test as its second prong"); Ortiz Br. at 62 (arguing that even if the evidence comes outside of Rule 404(b)'s parameters as intrinsic, "it should nonetheless have been excluded as substantially more prejudicial than probative").

[319] The Government filed a notice of its intent to introduce evidence of Dr. MK's death, and Dr. Ortiz filed a motion to exclude such evidence. ROA.486, 490 (Gov't Notice of Intent); ROA.700-02, 715-18 (Dr. Ortiz Motion to Exclude). The district court denied Dr. Ortiz's motion. ROA.1352.

[320] *See United States v. Lara*, 23 F.4th 459, 473-75 (5th Cir. 2022) (discussing Federal Rule of Evidence 103 and when a pretrial motion in limine is sufficient to preserve error on appeal); *see id.* at 474-75 (recognizing that the rule in *Mathis*, which provides that "[a] pre-trial objection is sufficient to preserve [an evidentiary] error for appellate review," has only been applied when "the relevant pretrial objection was denied"); *cf id.* at 475 ("When a district court *grants* a party's pretrial evidentiary objection, that party must contemporaneously object to any evidence it believes contravenes the district court's previous ruling."); *see also* FED. R. EVID. 103(b); FED. R. EVID. 103(b) advisory committee's note to 2000 amendment.

[321] Gov't Br. at 70; Ortiz Br. at 56.

No. 24-11032

error can be excused if it was harmless."[322] "This court has defined harmless error as 'any error, defect, irregularity or variance that does not affect substantial rights.'"[323] "The government bears the burden of proving beyond a reasonable doubt that [an evidentiary] error was harmless."[324]

The Government has met its burden to demonstrate that any error in admitting this evidence was harmless. "[U]nless there is a 'reasonable possibility that the improperly admitted evidence contributed to the conviction,'" this court will not find the error harmful.[325] In conducting our harmlessness analysis, we may consider whether the evidence against the defendant at trial was "substantial"[326] and whether the district court gave any limiting instructions when charging the jury.[327]

First, as outlined above, there was substantial evidence of Dr. Ortiz's guilt. Second, the jury charge mitigated any harm. The jury charge instructed that the jury "must not consider any" "evidence of acts of the defendant which may be similar to those charged in the indictment, but which were committed on other occasions" "in deciding if the defendant

---

[322] *United States v. Nguyen*, 504 F.3d 561, 571 (5th Cir. 2007).

[323] *Id.* (quoting *United States v. Treft*, 447 F.3d 421, 425 (5th Cir. 2006)).

[324] *Id.* (quoting. *Treft*, 447 F.3d at 425).

[325] *United States v. Williams*, 620 F.3d 483, 492 (5th Cir. 2010) (quoting *United States v. Mendoza–Medina*, 346 F.3d 121, 127 (5th Cir.2003)).

[326] *See id.* at 493 ("We cannot say that the brief, vague exchange on Track 8 contributed to Williams's conviction in light of the substantial evidence of Williams's guilt presented at trial."); *Mendoza-Medina*, 346 F.3d at 129 ("We must next decide whether the error was harmless. The evidence against Mendoza–Medina is substantial. . . . Given the strength of this evidence we conclude that admission of this testimony, although error, was harmless."); *United States v. Naidoo*, 995 F.3d 367, 376 n.3 (5th Cir. 2021) ("Even assuming that the admission of this particular video was in error, that error was harmless in light of the overwhelming evidence of Naidoo's guilt.").

[327] *See Nguyen*, 504 F.3d at 573.

committed the acts charged in the indictment,"[328] but could only consider such evidence to determine "[w]hether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment; or [w]hether the defendant had a motive or the opportunity to commit the acts charged in the indictment."[329] It also informed the jury that "questions, statements, objections, and arguments" made by the lawyers are not evidence.[330] The Supreme Court has stated that "juries are presumed to follow their instructions,"[331] and this court has stated that limiting instructions "greatly minimize any risk of undue prejudice posed by the admission of extrinsic evidence."[332] "[G]iven the strength of the [G]overnment's case and the district court's limiting instructions," we conclude that "the error was harmless."[333]

Dr. Ortiz argues that the Government cannot contend that the Dr. MK evidence was probative and at the same time argue that it did not contribute to the conviction (i.e., was not harmful).[334] However, the fact that the evidence was probative[335] does not necessarily mean that the other

_____

[328] ROA.1112.

[329] ROA.1113.

[330] ROA.1108. *See Zafiro v. United States*, 506 U.S. 534, 541 (1993) (considering that the judge admonished the jury that opening and closing arguments are not evidence when analyzing whether jury instructions cured any possibility of prejudice).

[331] *Id.* at 540. (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

[332] *United States v. Garcia Mendoza*, 587 F.3d 682, 689 (5th Cir. 2009).

[333] *United States v. Nguyen*, 504 F.3d 561, 573 (5th Cir. 2007).

[334] Ortiz Reply Br. at 32-33.

[335] The Government argues the MK evidence was probative because (1) it countered the defense's trial strategy that the IV bags did not cause the hypertensive episodes since explanations like "physician error, medications administered during surgery, surgical pain, and/or waking up from anesthesia" did not apply to Dr. MK and (2) the MK evidence was of the same nature as the charged offenses. The Government

No. 24-11032

evidence was not sufficient or "overwhelming" for the jury to convict Dr. Ortiz on the charges in the indictment.

## IV

Dr. Ortiz next argues that the district court abused its discretion in allowing Dr. Hail to testify after she violated Federal Rule of Evidence 615—the rule regarding witness sequestration (the Rule). "The district court has broad discretion to determine whether Rule 615 has been violated."[336] "Even if the Rule has been violated, the trial court has discretion to allow the testimony thereafter."[337] "In general, failure of a witness to abide by the sequestration order rarely will require reversal."[338] "To reverse a judgment based on a decision to include testimony that violated a sequestration order," this court requires a party to "demonstrate an abuse of discretion and 'sufficient prejudice.'"[339] "[T]o determine whether the defendant suffered 'sufficient prejudice' to warrant reversal on account of . . . witness[]

---

argues it was not prejudicial because (1) it made up only a small portion of the trial (less than 30 pages out of 1350 pages of testimony), and (2) the jury charge mitigated any risk that the jury convicted Ortiz because of the uncharged MK offense. Gov't Br. at 75-76.

[336] *Cruz v. Maverick County*, 957 F.3d 563, 570 (5th Cir. 2020).

[337] *Id.* at 571 (citing *United States v. Wylie*, 919 F.2d 969, 976 (5th Cir. 1990)); *see United States v. Ortega-Chavez*, 682 F.2d 1086, 1089 (5th Cir. 1982) ("While Rule 615 sequestration is mandatory, this Court has held that a trial court has discretion to allow the testimony of a witness who has violated the Rule . . . .").

[338] *Cruz*, 957 F.3d at 571 (quoting *Verdin v. Sea-Land Serv.*, No. 92-2833, 1993 WL 455645, at *4 (5th Cir. Oct. 25, 1993) (unpublished)).

[339] *Id.* at 570 (quoting *Wylie*, 919 F.2d at 976).

testimony," this court "use[s] a de novo standard for [its] review of the record."[340]

Pretrial, Dr. Ortiz successfully moved to exempt his investigator from the district court's invocation of the Rule.[341] Likewise, the Government successfully moved to exempt two agents from the Rule just before witness testimony began, but only one agent was allowed to observe testimony at a time.[342] The Government did not move to exempt its expert witness on anesthesia, Dr. Hail, but she nevertheless observed the trial proceedings.[343] Dr. Ortiz objected to her testifying since she was not exempted from the Rule, but the district court responded, "I think you have to get permission [for an expert witness to be exempt], but I'll grant permission after the fact."[344] Dr. Ortiz "move[d] to have [Dr. Hail] struck" because he "did not have [his] expert witness listening in or present," and the court overruled the objection.[345] When Dr. Ortiz's expert testified, the Government emphasized on several occasions that she did not hear any of the trial testimony.[346]

_____

[340] *Wylie*, 919 F.2d at 976 (citing *United States v. Womack*, 654 F.2d 1034, 1040 (5th Cir. Unit B Aug. 1981)).

[341] FED. R. EVID. 615; ROA.1351.

[342] ROA.1433.

[343] ROA.2369-70.

[344] ROA.2370.

[345] ROA.2370.

[346] *See, e.g.*, ROA.2657 ("Q. Did you try to figure out what happened by talking to the surgeons and the anesthesiologists involved? A. No, I reviewed the records. Q. Okay. So . . . you didn't hear any of the testimony about what happened during these incidents? A. No. Q. And you didn't -- before this when you were forming these opinions you didn't pick up the phone and try to call anybody and try to figure out what happened? A. That's not what I was asked to do. I was asked to review the medical records and asked . . . to comment on very specific aspects. It was not to evaluate what happened or what didn't happen."); ROA.2670 ("Q: But you didn't review his testimony that he gave in court here

No. 24-11032

Dr. Ortiz contends that the district court abused its discretion because it never exercised any discretion to begin with, since, as he argues, the court thought "no violation of the Rule had occurred."[347]  He also contends that even if the court exercised discretion, it abused its discretion because Dr. Hail's testimony was not cumulative and the Government knew such testimony would be necessary from the beginning of trial.[348]

The Government responds that Dr. Hail's presence in the courtroom was consistent with the Rule's main purposes because she was not a fact witness, and her presence in the courtroom "benefited the search for truth" because it allowed Dr. Hail to provide a more accurate expert opinion based on the facts as introduced at trial.[349]  The Government further contends that any violation of the Rule was not willful because expert witnesses are "routinely exempted" in the Northern District of Texas, it believed

---

a few days ago, did you? A: No, I did not."); ROA.2676 ("Q: . . . [S]o you didn't hear any testimony about -- or you didn't look at any documents about when those things were done? A: I looked at the op note and I looked at the nurse's note and neither one of them document when they gave the amounts. This anesthesia record doesn't even document the different bags of tumescent fluids when they were hung or not hung. Once, again, I have not heard any testimony in court . . . ."); ROA.2691 ("Q: And the testimony that was heard in this court was that his heart -- there was a concern that his heart was stopping because it was -- you know, his blood -- his pulse tripled and at certain points between the five minute intervals his heart stopped. That was the testimony that was given in this court. Are you aware of that? A: I didn't hear any of the testimony that was given in court. So there's nothing documented here and nobody has written that [JA's] heart stopped and that would be something we would absolutely document on the record. And you don't vacillate between a heart stopping and blood pressures of 200 within a minute.").

[347] Ortiz Br. at 71-72.

[348] Ortiz Br. at 72.

[349] Gov't Br. at 85.

"defense counsel was operating under the same understanding," and it "did not hide Dr. Hail's presence."[350]

## A

The district court exercised discretion in permitting Dr. Hail to testify. When discussing whether the Government had moved to exempt Dr. Hail from the Rule, the court stated, "I think you have to get permission, but I'll grant permission after the fact."[351] This suggests the court thought that a violation had occurred but nevertheless decided to allow Dr. Hail to testify. It therefore exercised its "broad discretion"—albeit in a conclusory manner—in allowing Dr. Hail to testify despite the Government's failure to seek permission when the court invoked the Rule.[352]

This court has stated that in determining whether the trial court abused its discretion, "the focus is upon whether the witness's out-of-court conversations [in violation of the Rule] concerned substantive aspects of the trial and whether the court allowed the defense fully to explore the

---

[350] Gov't Br. at 85-86; *see* ROA.2370 ("[The prosecution's] understanding is the baseline rule is that an expert witness who is not a fact witness involved in the events is permitted to witness the trial testimony."); ROA.2382 (the court asking defense counsel "how long have you been practicing here . . . [and] [w]hen have you ever seen an expert not exempted from the rule?"); ROA.384 (the defendant's notice of expert testimony stating that the "cases about which [the expert] may be asked to testify at trial [would] be highly dependent on the testimony provided by the government's witnesses"); ROA.2369 (defense counsel recognizing that "Dr. Hail ha[d] been present in the courtroom for the entire trial").

[351] ROA.2370.

[352] Dr. Ortiz cites no caselaw stating that a district court's lack of explanation constitutes an abuse of discretion. Nonetheless, there is one here in that Dr. Hail was an expert, and experts are ordinarily exempt from the Rule, which the district court recognized when deciding to allow Dr. Hail to testify.

conversation during cross-examination."[353] That is because the purpose of the Rule is "to aid in detecting testimony that is tailored to that of other witnesses and is less than candid."[354] This court has already recognized that "experts [are] not witnesses whose recollections might [be] colored by accounts of prior witnesses" due to their "testifying solely as to their opinion based on the facts or data in the case."[355]

Dr. Ortiz has not argued that Dr. Hail had outside conversations in violation of the Rule or that he lacked ample opportunity to question Dr. Hail about any supposed "outside conversations."[356] Dr. Ortiz does contend that an "expert cannot change the brute facts of the case, but she can subtly alter the theories she offers to fit them."[357] True, but the reason experts are often exempted from the Rule is because they are *supposed* to opine based on the facts in the case, and sometimes those facts come out at trial.[358] Moreover,

---

[353] *United States v. Wylie*, 919 F.2d 969, 976 (5th Cir. 1990).

[354] *Id.* (citing *United States v. Ell*, 718 F.2d 291, 293 (9th Cir. 1983) and *United States v. Lamp*, 779 F.2d 1088, 1095 (5th Cir. 1986)).

[355] *Mayo v. Tri-Bell Indus., Inc.*, 787 F.2d 1007, 1012-13 (5th Cir. 1986) (concluding that the trial court did not abuse its discretion in allowing experts to testify even after violating Rule 615 by having lunch with several other witnesses); *see also United States v. Reynolds*, 534 F. App'x 347, 365 (6th Cir. 2013) (unpublished) (noting that a "classic example" of a person who is "essential" to a party's case under Rule 615 is "an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others" (quoting *Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 629 (6th Cir. 1978))); *but see Morvant*, 570 F.2d at 630 (explaining that the "breadth" of an expert's "permissible scope of testimony" suggests that a trial judge could "be justified in holding that his presence in the courtroom was not essential and that his exclusion from the courtroom might in a given case make a more objective and, perhaps, more honest witness out of him").

[356] *See* Ortiz Br. at 71-75.

[357] Ortiz Reply Br. at 40.

[358] *See, e.g.*, *Morvant*, 570 F.2d at 630 (holding that when "a party seeks to except an expert witness from exclusion under Rule 615 on the basis that he needs to hear firsthand

while this court has taken into consideration whether testimony from a non-expert witness who violated the Rule was cumulative,[359] such a consideration has not been dispositive in deciding whether the trial court abused its discretion.[360]

Dr. Ortiz cites this court's decision in *Miller v. Universal City Studios, Inc.*[361] to rebut this court's recognition in *Mayo v. Tri-Bell Industries, Inc.*[362] that an expert's testimony is not usually "colored by accounts of prior witnesses."[363] Although *Miller* recognized that an expert is not automatically exempt from the Rule,[364] the idea that an expert is not automatically exempt does not contradict this court's proposition in *Mayo*—that an expert's testimony is not usually "colored" by prior witness testimony. In addition, to the extent Dr. Ortiz thought such testimony was colored, his counsel had the opportunity to cross-examine Dr. Hail.[365]

---

the testimony of the witnesses, the decision whether to permit him to remain is within the discretion of the trial judge and should not normally be disturbed on appeal").

[359] *See United States v. Ortega-Chavez*, 682 F.2d 1086, 1090 (5th Cir. 1982) (considering whether the defendant demonstrated an abuse of discretion or sufficient prejudice and stating that the witnesses' "testimony merely confirmed that of four previous witnesses").

[360] *See id.* (also considering when the government knew the witness testimony would be necessary); *see also United States v. Wylie*, 919 F.2d 969, 976 (5th Cir. 1990) ("In evaluating whether an abuse of discretion has occurred, the focus is upon whether the witness's out-of-court conversations concerned substantive aspects of the trial and whether the court allowed the defense fully to explore the conversation during cross-examination.").

[361] 650 F.2d 1365 (5th Cir. July 1981).

[362] 787 F.2d 1007 (5th Cir. 1986).

[363] *Id.* at 1013; Ortiz Reply Br. at 39-40.

[364] *Miller*, 650 F.2d at 1374.

[365] *See Wylie*, 919 F.2d at 976.

No. 24-11032

To be sure, the Government would have known Dr. Hail's testimony was necessary at the start of trial. However, the Government's violation of the Rule does not appear willful. The district court stated, and Dr. Ortiz's counsel acknowledged, that experts are routinely exempted from the Rule in the Northern District of Texas.[366] Although the Government sought to exempt two of its agents prior to trial, it does not appear from this fact alone that the Government intentionally violated the Rule. Rather, it seems the Government failed to seek Dr. Hail's exemption from the Rule out of oversight. Even Dr. Ortiz's counsel seemed to recognize that throughout his "19 years" of practice, experts had always been exempted from the Rule.[367]

Additionally, while the district court did not need to conclude that Dr. Hail was essential to permit her to testify after violating the Rule,[368] the record would support the district court implicitly concluding that Dr. Hail was an essential witness.[369] In total, the district court did not abuse its discretion in allowing Dr. Hail to testify.[370]

---

[366] ROA.2370; ROA.2381-82.

[367] *See* ROA.2382 ("The Court: . . . And how long have you been practicing here . . . ? When have you ever seen an expert not exempted from the rule? [Defense Counsel]: I have never seen it happen without having been notified first in 19 years.").

[368] *See Cruz v. Maverick County*, 957 F.3d 563, 570-72 (5th Cir. 2020); *see also United States v. Ortega-Chavez*, 682 F.2d 1086, 1089-90 (5th Cir. 1982).

[369] *See* ROA.168-70 (Government's Disclosure of Expert Witness) (stating that Dr. Hail would testify to her review of TY, JE, KP, and JA's incidents and to the effect of certain fluids being administered intravenously).

[370] *See Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1209 (5th Cir. 1993) ("Whether or not a witness is essential, and hence should be exempt from Rule 615 exclusion, is a matter soundly within the discretion of the trial court. We will not upset this determination absent an abuse of that discretion.").

No. 24-11032

## B

Even if we concluded that the district court did abuse its discretion, Dr. Ortiz cannot show sufficient prejudice. Dr. Ortiz argues the prejudice was "singular," in that the Government had the ability to discredit his expert witness by pointing out during cross-examination that his expert did not observe any trial testimony.[371] Dr. Ortiz contends that if the Government had sought to exempt Dr. Hail, he "would have done the same" for his own expert.[372]

Dr. Ortiz's argument that he could have sought to exempt his expert if the Government had sought to exempt Dr. Hail is unavailing. As the district court recognized, Dr. Ortiz could have sought to exempt his expert irrespective of whether the Government sought to exempt its expert.[373] The Government is not to blame for something wholly within Dr. Ortiz's counsel's control.

As for the Government discrediting Dr. Ortiz's expert for not hearing any testimony in court[374]—the Government could have done so even if Dr. Hail had not observed testimony. More than that, though, Dr. Ortiz's expert suggested that she was hired only to review the medical records and render an opinion based on those records, and not to observe testimony or discuss the events with the surgeons and anesthesiologists involved. Specifically, she stated that she "was asked to review the medical records and asked . . . to comment on very specific aspects. It was not to evaluate what happened or what didn't happen. . . . [But to determine] what happened during these

---

[371] Ortiz Br. at 73-74.

[372] Ortiz Br. at 74.

[373] ROA.2381-82.

[374] *See supra* note 345.

58

anesthetics and what the records and the medications and the hemodynamics may represent."[375]   She also admitted on the stand that observing trial testimony would not have changed at least some of her opinions because, regardless, she would have relied on the medical records.[376]   In addition, whenever the Government did bring up the fact that she did not observe any testimony, it was often to clarify what facts she knew in reaching her conclusions—something that would be expected on any cross-examination of an expert.[377]   Dr. Ortiz has failed to show that he was sufficiently prejudiced by the district court permitting Dr. Hail to testify.

## C

Dr. Ortiz alternatively argues that the district court abused its discretion by not *sua sponte* sanctioning the Government for violating its order invoking the Rule.[378]   Dr. Ortiz adapts to this context the factors this court considers when reviewing discovery sanctions.[379]   The Government

---

[375] ROA.2657-58.

[376] *See, e.g.*, ROA.2673-74 ("Q: Did you hear that testimony? A: I did not. Q: Okay. So does that affect . . . the testimony that you gave . . . earlier about, you know, what you think about -- A: No, it doesn't because there's no documentation . . . I do not know and I don't think the anesthesiologist did either, because it's hard to remember that if it's not written down."); ROA.2691 (in addressing a question regarding testimony that JA's heart stopped beating, she stated it "would absolutely [be] document[ed] on the record," which she reviewed).

[377] *See, e.g.*, ROA.2641 (asking whether she knew if Surgicare had ever had a patient die); ROA.2657 (eliciting that she did not talk to the surgeons or anesthesiologists involved, nor hear their testimony, but only reviewed the medical records); ROA.2673 (sharing with her the testimony that had been given and asking whether that changed her conclusion).

[378] Ortiz Br. at 75-76; ROA.1433 (invoking the Rule).

[379] *See United States v. Garrett*, 238 F.3d 293, 298 (5th Cir. 2000) ("[A] district court exercising its discretion and considering the imposition of sanctions for discovery violations should consider the following factors: 1) the reasons why disclosure was not

responds that Dr. Hail was an essential witness to its claims and that the district court has "broad discretion in determining what, if any, sanction should be imposed."[380]

The district court did not abuse its discretion in imposing no sanctions, including refusing to strike Dr. Hail as a witness. First, the district court concluded that Dr. Ortiz suffered no prejudice,[381] but to the extent that he did, it was "self-inflicted."[382] Dr. Ortiz's counsel did not seek an exemption for his own expert. Second, the district court could have recognized the Government's failure to seek an exemption as mere oversight and not sanctionable conduct based on the court's practice of routinely exempting experts from the Rule.[383] Adding to the reasonability of this proposition is that experts are routinely exempted from the Rule as essential witnesses, not just in the Northern District of Texas, but broadly.[384] Third,

---

made; 2) the amount of prejudice to the opposing party; 3) the feasibility of curing such prejudice with a continuance of the trial; and 4) any other relevant circumstances.").

[380] Gov't Br. at 91.

[381] ROA.2381 ("I don't think there's any prejudice, because if you had asked to have your experts exempted I would have done that as is routinely the case in this part of the world.").

[382] ROA.2382 ("So the fact that you chose not to ask for permission is self-inflicted. And how long have you been practicing here . . . ? When have you ever seen an expert not exempted from the rule?").

[383] ROA.2381-82.

[384] *See United States v. Reynolds*, 534 F. App'x 347, 365 (6th Cir. 2013) (noting that a "classic example" of a person who is "essential" to a party's case under Rule 615 is "an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others" (quoting *Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 629 (6th Cir. 1978))); *United States v. Lussier*, 929 F.2d 25, 30 (1st Cir. 1991) ("Whether one denominates [the witness] as a 'fact' or 'expert' witness, it is clear that his testimony was based on, summarized, and was consistent with the evidence presented at trial, and that there would have been 'little, if any[,] reason' to sequester him." (quoting *Morvant*, 570 F.2d at 629)); *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 53-54 (2d Cir. 1993) (explaining that

No. 24-11032

the Government did not willfully violate the Rule, as discussed above. The district court was well within its discretion not to impose sanctions.

## V

Dr. Ortiz argues the district court plainly erred by not intervening when the Government stated during closing argument: "And, you know, only one person in this room knows what was actually used to adulterate those bags."[385] Dr. Ortiz concedes that he did not preserve this issue for appeal[386] and accordingly bears the burden to show that the Government's comment constitutes plain error.[387] Under the plain-error standard of review, this court requires Dr. Ortiz to show "(1) there was error; (2) it was plain; (3) it affected his substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings."[388]

## A

Dr. Ortiz contends the district court erred because he has a Fifth Amendment right to remain silent, and the Government's comment on his

---

the advisory committee notes to the Rule expected that expert witnesses would qualify for the exception for essential witnesses); *Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 629 (4th Cir. 1996) ("Because Rule 615 is designed to preclude fact witnesses from shaping their testimony based on other witnesses' testimony, it does not mandate the sequestration of expert witnesses who are to give *only* expert opinions at trial. Indeed, an expert who is not expected to testify to facts, but only assumes facts for purposes of rendering opinions, might just as well hear all of the trial testimony so as to be able to base his opinion on more accurate factual assumptions.").

[385] *See* Ortiz Br. at 77-84; ROA.2875.

[386] Ortiz Br. at 77-78; Gov't Br. at 92.

[387] *See United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) ("[T]he burden of establishing entitlement to relief for plain error is on the defendant claiming it.").

[388] *United States v. Cervantes*, 706 F.3d 603, 616 (5th Cir. 2013).

silence infringed on that right.[389] "The test for determining whether the prosecutor's remarks [on the defendant's silence] were constitutionally impermissible is: '(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.'"[390] "The prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark."[391] "As for the second possibility, 'the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury *necessarily* would have done so.'"[392]

Dr. Ortiz cannot demonstrate that the Government's comments were constitutionally impermissible and therefore cannot demonstrate error. Examined in context, there is a plausible explanation for the remark: the Government was attempting to rebut what Dr. Ortiz highlighted as inconsistent evidence.

During the Government's closing argument, it responded to several of Dr. Ortiz's closing arguments. When it made the allegedly improper statement, it was responding to Dr. Ortiz pointing out that JA's blood did not test positive for bupivacaine, yet bupivacaine was discovered in his IV bag.[393] The Government responded as follows:

---

[389] Ortiz Br. at 77-80.

[390] *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996) (quoting *United States v. Collins*, 972 F.2d 1385, 1406 (5th Cir.1992)).

[391] *Id.* (citing *Collins*, 972 F.2d at 1406).

[392] *Id.* (quoting *Collins*, 972 F.2d at 1406).

[393] ROA.2862.

> The next Defense argument, [is that JA]'s blood did not test positive for bupivacaine.  Well, [JA]'s blood did test positive for ephedrine, which is a common anesthesia drug, but was not given to him during these procedures.  [KP]'s blood did test positive for bupivacaine despite not having received any bupivacaine for about 36 hours.  *And, you know, only one person in this room knows what was actually used to adulterate those bags.*  The dose [JA] received was likely very small.  And then we have the Defense's largest point about confirmation bias.[394]

The context in which the statement was made demonstrates that the Government was suggesting that knowledge about what was really in the IV bags, which "only one person in [the] room" knew, was not necessary to find Dr. Ortiz guilty.  The Government emphasized that JA's blood did test positive for ephedrine, medication that was not supposed to be there, which indicated that Dr. Ortiz's observation about bupivacaine being in JA's IV bag but not in his blood was more or less hollow.  The Government also explained the inconsistency: the dose of bupivacaine JA received was small.

For similar reasons, the jury could not have "necessarily" construed the comment as one on Dr. Ortiz's silence.  Setting aside the fact that this comment was made when rebutting Dr. Ortiz's arguments and in the middle of attempting to explain an inconsistency in the evidence, the comment comprised two lines of a twenty-six-page closing argument transcript.  Given the context in which the comment was made, and the length of the Government's closing argument, it would be difficult to conclude that the jury "necessarily" construed such a comment as commenting on Dr. Ortiz's silence.  Even the court and Dr. Ortiz's counsel—who are supposed to be

---

[394] ROA.2875 (emphasis added).

listening for and objecting to such comments—failed to recognize it as a comment on his silence.

Dr. Ortiz cites this court's decision in *Madden v. Collins*[395] to support his argument that the district court erred and that such error was clear and obvious.[396]  In *Madden*, this court found error when the prosecutor stated the following in closing argument:

> Then, also, the defense will argue that why in the world would someone who killed, murdered two people and stole this credit card sign their own name to the Texaco card?  I don't know that; you don't know why.  There's only one person here that knows why, and there's only one person here that knows the answer to all of these questions.[397]

This court explained that this comment "could apply only to" the defendant and "it undeniably direct[ed] the jury's attention to [the defendant's] silence."[398]

*Madden* is distinguishable for two reasons.  First, the defendant in *Madden* was arrested after signing his name to the victim's Texaco card that the prosecutor referred to, making it an impactful piece of evidence.[399]  The *Madden* court recognized as much: "The statement was made in connection with Madden's signature . . . a mistake which led to his capture. Admittedly, the card also suggested [his] guilt as it tended to place him at the scene of the

---

[395] 18 F.3d 304 (5th Cir. 1994), *abrogation on other grounds recognized by*, *Smith v. Quarterman*, 515 F.3d 392, 408 (5th Cir. 2008).

[396] Ortiz Br. at 79-80.

[397] *Madden*, 18 F.3d at 309.

[398] *Id.*

[399] *Id.* at 305.

crime and implicate him in the robbery of the victim."[400]   Here, the Government was rebutting an inconsistency in the evidence that arguably did not matter since JA's blood results revealed a different medication that was not supposed to be there.  Second, the prosecutor in *Madden* discussed the defendant's silence more broadly, stating that the defendant knew the answer to "all" the unanswered questions in the case.[401]  Here, the Government did not speak to Dr. Ortiz's silence in broad terms, but only that he would have known the answer to exactly what medications were in JA's IV bag (which involved two out of ten counts).

Moreover, this case is more like this court's later decision in *Lucas v. Johnson*.[402]  In *Lucas*, this court held that the following comment was not a comment on the defendant's failure to testify:

> The handwriting comparison on the matches with Henry Lee Lucas was inconclusive.  We don't know that those are his matches; they might have been the girl's matches.  She might have written in the matchbook; we don't know that.  Only one person does know that, and that's Henry Lee Lucas.[403]

This court explained that "[t]he overall point of the prosecutor's statements appears to be an argument that Lucas's guilt did not hinge on whether Lucas or the victim owned the matches."[404]  Similarly, here, the overall point of the Government's statements were that Dr. Ortiz's guilt did not hinge on the IV

---

[400] *Id.* at 309.

[401] *Id.*

[402] 132 F.3d 1069 (5th Cir. 1998).

[403] *Id.* at 1079 & n.6.

[404] *Id.* at 1079.

bag versus blood test discrepancy. For this reason, even if there was error, it was not clear and obvious.

Insofar as Dr. Ortiz argues that this court must follow *Madden* under the rule of orderliness, we disagree.[405] The decisions do not conflict.[406] As stated above, in *Madden*, the prosecutor's statement *broadly* addressed the defendant's silence; in *Lucas*, the prosecutor's statement *narrowly* addressed the defendant's silence—the statement was confined to explaining that knowledge about a certain fact did not need to be determined to find the defendant guilty. Here, the Government did not commit plain error by making a comment that addressed Dr. Ortiz's silence narrowly while refuting Dr. Ortiz's closing arguments.

**B**

Even if we concluded there was plain error, it would be harmless.[407] To show that an error affected his substantial rights, Dr. Ortiz must demonstrate that there was "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different."[408] Dr.

---

[405] *See Nivelo Cardenas v. Garland*, 70 F.4th 232, 242 n.7 (5th Cir. 2023) (discussing the rule of orderliness and stating that "[t]o the extent two panel decisions conflict, the earlier decision controls" (citing *GlobeRanger Corp. v. Software AG U.S. of Am., Inc.*, 836 F.3d 477, 497 (5th Cir. 2016))).

[406] *See Barrientes v. Johnson*, 221 F.3d 741, 780-81 (5th Cir. 2000) (discussing both *Lucas* and *Madden* and not suggesting in any way that the two decisions conflict).

[407] *See Madden v. Collins*, 18 F.3d 304, 310 (5th Cir. 1994); *Lucas*, 132 F.3d at 1079 ("[E]ven if the remark were construed as a comment on his failure to testify, there is no indication that it was an error having a 'substantial and injurious effect or influence in determining the jury's verdict.'" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993))).

[408] *United States v. Dominguez Benitez*, 542 U.S. 74, 81-82 (2004) (alteration in original) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of BLACKMUN, J.)).

No. 24-11032

Ortiz cannot make that showing, as the Government presented sufficient evidence of his guilt that such a comment would not have reasonably altered the outcome.[409]

Additionally, the district court's jury instructions would have cured any prejudicial effect.[410]  The jury instructions admonished the jury that "[t]he law does not require a defendant to prove his innocence or produce any evidence at all and no inference whatever may be drawn from the election of a defendant not to testify."[411]  The instructions further stated that the jury "must consider only the evidence presented during the trial" and that any "arguments made by the lawyers are not evidence."[412]

---

[409] *See, e.g.*, *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003) (taking into account the "overwhelming evidence of guilt" when concluding that the prosecution's statement had no substantial effect in the determination of the defendant's guilt); *Madden*, 18 F.3d at 309 (considering the "other evidence" suggesting the defendant's guilt when determining that the prosecutor's statement was harmless error).

[410] *See United States v. Bohuchot*, 625 F.3d 892, 901 (5th Cir. 2010) (concluding that the prosecutor's comments, "[e]ven if . . . improper" were "not sufficiently prejudicial to 'cast serious doubt on the correctness of the jury's verdict'" in light of the evidence and cautionary jury instructions that stated "no inference or conclusion may be drawn from a defendant's decision not to testify" (quoting *United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir. 2001))); *see also Cotton*, 343 F.3d at 752 ("Given the overwhelming evidence of guilt and the court's cautionary instruction to the jury, we conclude that the prosecution's statement had no substantial and injurious effect or influence in the determination of Cotton's guilt."); *Nethery v. Collins*, 993 F.2d 1154, 1159 (5th Cir. 1993) (stating that this court "must view the error in light of the court's curative instruction and consider whether the residual impact had any "substantial and injurious effect or influence in determining the jury's verdict" and concluding that the court was not "prepared to say that this assumed error was not corrected by the court's curative instruction" (citing *Donnelly v. De Christoforo*, 416 U.S. 637 (1974))).

[411] ROA.1107.

[412] ROA.1108.

No. 24-11032

For the same reasons, Dr. Ortiz cannot show that any error affected the fairness, integrity, and public reputation of judicial proceedings.

\* \* \*

Based on the foregoing, we AFFIRM the district court's judgment.

No. 24-11032

Stephen A. Higginson, *Circuit Judge*, dissenting as to Part III.B to order limited remand:

The defendant, the government, and jurors devoted two weeks to this federal drug adulteration criminal trial. It would be regrettable to require that effort over again. However, I cannot say that the grisly Dr. M.K. evidence—a brutal murder, recited with unimaginable anguish by a grieving widow who described his late wife's horrible, bewildered final moments—was harmless in this close, entirely circumstantial case about medical tampering. *See United States v. Fortenberry*, 860 F.2d 628, 632 (5th Cir. 1988); *United States v. Hernandez-Guevara*, 162 F.3d 863, 872 (5th Cir. 1998).

Of course, reasonable minds often differ on harmlessness, so I greatly respect that my colleagues come to a different conclusion. *Compare* Roger Traynor, *The Riddle of Harmless Error* (1970), *with* Justin Murray, *A Contextual Approach to Harmless Error Review*, 130 Harv. L. Rev. 1791 (2017), *and* Brandlon L. Garrett, *Patterns of Error*, 130 Harv. L. Rev. F. 287 (2017); *cf. United States v. Dominguez Benitez*, 542 U.S. 74, 86–87 (2004) (Scalia, J., concurring in judgment) (observing that "ineffable gradations of probability seem to me quite beyond the ability of the judicial mind (or any mind) to grasp . . . . especially so when they are applied to the hypothesizing of events that never in fact occurred").

Furthermore, I agree with my colleagues' assumption that the district court *did* err under Rules 104, 403, and 404 when it admitted the murder evidence. That error is unfortunate. The government does not point to record evidence that the district court conducted a pretrial evidentiary hearing, which the defense requested; or to any district court written ruling, analysis, or citation of law in addressing the murder evidence; or to any district court particularized finding as to the murder evidence under Rule 404(b); or to a *Huddleston* determination, though it was challenged; or to any *Beechum* balancing, though that is obligatory. As to the murder evidence, the

district court appears only to have announced pretrial, "I'm going to permit the 404(b) stuff."

To ensure a fair trial in this complex case, the district court was required to do more with such tragic, impactful evidence. I don't diminish its significance, which the district court noted at sentencing, saying: "I just want to say in my view in a moral sense, not necessarily in a legal sense, Defendant Ortiz is, in fact, being punished for the death of Dr. Kaspar and the other unindicted victims who suffered from his conduct." Again, this extrinsic evidence was horrific, and possibly germane and admissible earlier, at trial—but only after fair and requested adjudication, for carefully limited, instructed purposes.

For these reasons and on this issue only, I would order a limited remand for full application of Rules 104, 403, and 404 by the district court in the first instance, consistent with remands we have ordered before. *See, e.g.*, *United States v. Elwood*, 993 F.2d 1146, 1153–54 (5th Cir. 1993); *United States v. Anderson*, 933 F.2d 1261, 1277 (5th Cir. 1991); *United States v. Zabaneh*, 837 F.2d 1249, 1266 (5th Cir. 1988); *see also United States v. Hamilton*, 723 F.3d 542, 545–46 (5th Cir. 2013).